## HUTCHINSON INVESTMENT COMPANY *v.* CALDWELL.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 190. Argued January 3, 4, 1894. — Decided March 5, 1894.

In States whose laws permit illegitimate children, recognized by the father in his lifetime, to inherit from him, such children are "heirs" within the meaning of Rev. Stat. § 2269, which provides that when a party entitled to claim the benefits of the preëmption laws of the United States dies before consummating his claim, his executor or administrator may do so, and the entry in such case shall be made in favor of his heirs, and the patent, when issued, inure to them as if their names had been specially mentioned.

THIS was an action brought by John Caldwell against D. B. Miller (for whom the Hutchinson Investment Company

was substituted) and L. B. Miller in the District Court for Reno County, Kansas, to have his title established and recover possession of the northeast quarter of section twelve, township twenty-three south, range six west, in that county. The case was submitted to the District Court for trial, a jury being waived, and the court made special findings of fact and gave judgment in favor of the defendants, whereupon the cause was taken on error to the Supreme Court of Kansas. The Supreme Court reversed the judgment of the court below and remanded the cause with a direction to enter judgment upon the findings of fact in favor of Caldwell and against the defendants for an undivided thirteen twenty-eighths of the land and damages for its detention, and thereupon this writ of error was brought.

The facts necessary to be stated were in brief these: Robert Titus was married to Phœbe Thomas in Vermont in 1809, and the sole issue of this marriage was Alden W. Titus, born in October, 1810. After the birth of this son, Robert Titus, having gone into the war of 1812, abandoned both wife and child, and, in 1818, without having obtained a divorce, had a marriage ceremony performed between him and Miriam Lee in the State of New York. By her he had five children, of whom the youngest was a daughter, Lois, who married D. B. Miller. From 1850, Robert Titus lived with Mr. and Mrs. Miller, and in 1871 the family went to Reno County, Kansas, and settled there. July 10, 1871, Robert Titus made a preemption entry upon the land in controversy, but died before consummating his preëmption claim. After his death, D. B. Miller, administrator of his estate, filed the necessary papers to complete the preëmption, paying the price thereof, four hundred dollars, to the United States, with his own money, and April 20, 1874, a patent to the land was issued, to the effect that "the United States of America, in consideration of the premises and in conformity with the several acts of Congress in such cases made and provided, have given and granted, and by these presents do give and grant, unto the said heirs of Robert Titus, deceased, and to their heirs, the tract above described; to have and to hold the same, together

with all the rights, privileges, immunities, and appurtenances of whatsoever nature belonging, unto the said heirs of Robert Titus, deceased, and to their heirs and assigns forever." The children of Robert Titus and Miriam Lee were notoriously recognized by Robert Titus as his own, and no question was ever raised as to their legitimacy until in this suit. D. B. Miller claimed the fee simple title to the land by conveyances from the heirs of Alden W. Titus, as the only heir of Robert Titus, deceased; and if the children of Robert Titus and Miriam Lee were heirs within the meaning of section 2269 of the Revised Statutes of the United States, then Caldwell was entitled to recover an undivided thirteen twenty-eighths of the land and damages.

The opinion of the Supreme Court of Kansas, by Horton, C. J., is reported in 44 Kansas, 12.

*Mr. Almerin Gillett* for plaintiffs in error.

*Mr. S. B. Bradford* and *Mr. G. A. Huron,* for defendant in error, filed a brief on his behalf, but the court declined to hear them.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

By the statutes of Kansas, which was the State of the domicil of Robert Titus at the time of his death, and of the location of the real estate in controversy, illegitimate children could inherit from their father when they had been recognized by him, provided such recognition was general and notorious, or in writing. Gen. Stat. Kansas, 786, c. 33, §§ 22, 23. Under the circumstances disclosed on this record, therefore, the grantees in a deed to the heirs of Robert Titus and to their heirs would have embraced the children of Miriam Lee and their heirs, and this would be so as respects this patent, unless section 2269 of the Revised Statutes, under which it was issued, provided otherwise.

The section reads: "Where a party entitled to claim the benefits of the preëmption laws dies before consummating his claim, by filing in due time all the papers essential to the establishment of the same, it shall be competent for the executor or administrator of the estate of such party, or one of the heirs, to file the necessary papers to complete the same; but the entry in such cases shall be made in favor of the heirs of the deceased preëmptor, and a patent thereon shall cause the title to inure to such heirs, as if their names had been specially mentioned." We are unable to concur with counsel for plaintiffs in error that the intention should be ascribed to Congress of limiting the words "heirs of the deceased preëmptor," as used in the section, to persons who would be heirs at common law (children not born in lawful matrimony being therefore excluded) rather than those who might be such according to the *lex rei sitæ*, by which, generally speaking, the question of the descent and heirship of real estate is exclusively governed. If such had been the intention, it seems clear that a definition of the word "heirs" would have been given, so as to withdraw patents issued under this section from the operation of the settled rule upon the subject.

That rule was thus referred to by this court in *United States* v. *Fox*, 94 U. S. 315, 320: "It is an established principle of law everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated;" and although Congress might have designated particular grantees to whom the land should go in the first instance, it did not do so, nor make use of words indicative of any intent that the law of the State should not be followed.

But it is contended that the word "heirs" was used in its common law sense, and it is true that technical legal terms are usually taken, in the absence of a countervailing intent, in their established common law signification, but that consideration has no controlling weight in the construction of this statute. Undoubtedly the word "heirs" was used as meaning, as at common law, those capable of inheriting, but

it does not follow that the question as to who possessed that capability was thereby designed to be determined otherwise than by the law of the State which was both the *situs* of the land and the domicil of the owner.

The object sought to be attained by Congress was that those who would have taken the land on the death of the preëmptor, if the patent had issued to him, should still obtain it notwithstanding his death, an object which would be in part defeated by the exclusion of any who would have so taken by the local law if the title had vested in him. In other words, Titus intended to acquire the title and had complied, or was proceeding to comply, in good faith, with the requirements of the law to perfect his right to it, and by this statute that right could be perfected after his death for the benefit of those who would have been entitled if his death had occurred after patent instead of before. If the provision admitted of more than one construction, that one should be adopted which best seems to carry out the purposes of the act. *Bernier* v. *Bernier*, 147 U. S. 242.

In this view, it was held in *Brown* v. *Belmarde*, 3 Kansas, 41, that the words "heirs of deceased reservees" in the act of Congress of May 26, 1860, c. 61, (12 Stat. 21,) which operated as an original grant to certain reservees and their heirs, designated the persons who were capable of inheritance by the law of the State when the act of Congress took effect. And see *Clark* v. *Lord*, 20 Kansas, 390.

So the usual rule was recognized in *Lamb* v. *Starr*, Deady, 350. By the fourth section of the Oregon Donation Act, of September 27, 1850, c. 76, (9 Stat. 496,) it was provided that if either the settler or his wife died before the issue of the patent, "the survivor and children or heirs of the deceased" should be entitled to the share or interest of the deceased in equal proportions; and the late Judge Deady, referring to the disposal of the share of a deceased wife, said that at the time of her death "there was no statute in Oregon regulating the descent of real property, or declaring who should be the heirs of an intestate, and, therefore, the subject was regulated by the common law. By this rule her children were her heirs.

The Donation Act does not prescribe who shall be considered the heirs of a deceased settler any more than it prescribes who shall be considered the wife of a settler. Both of these are left to the local law — the law of Oregon. If the law of Oregon at the time of Nancy's death had prescribed that brothers and sisters should be heirs to the intestate, either exclusive or inclusive of the children, it appears to me that, under the Donation Act, then the children would take to the exclusion of the brothers and sisters. Congress seems to have intended to secure the share of the deceased to her children, if any, whether the law of Oregon made them heirs or not. Beyond this it left the matter to the local law, by providing the alternative, that in default of children, such share should go to her heirs, whoever they might be. Who would be entitled to claim as heir of the deceased would, in all cases, depend upon the law of Oregon at the time of the death, but persons claiming as children are by the Donation Act preferred to those claiming simply as heirs by the local law." And in *Davenport* v. *Lamb*, 13 Wall. 418, 427, it was pointed out that the act of Congress of May 20, 1836, c. 76, (5 Stat. 31, Rev. Stat. § 2448,) providing that where patents had been issued to persons who had died, the title should inure to and become vested in "the heirs, devisees, and assigns" of the deceased, made the title inure in a manner different from that provided by the Donation Act, upon the death of either owner before the issue of the patent, because the survivor of the husband or wife was not his or her heir by any law of Oregon at the time of the death in that case.

There, is nothing to the contrary in *McCool* v. *Smith*, 1 Black, 459, which was a case coming to this court from Illinois, in which it was held that the meaning of the words "next of kin" was to be determined by the common law of England, because the common law in that regard was then in full force in that State.

The language of the acts of Congress has not been uniform in the matter of the disposition of the public domain, after the death of the principal beneficiary. Thus under section 2443, in respect of bounty lands granted to officers and soldiers of

the Revolutionary War or soldiers of the War of 1812, the patent when applied for by part of the heirs was to be issued in the name of the heirs, generally, and to inure to the benefit of the whole in such portions as they were severally entitled to by the laws of descent in the State or Territory of the decedent's domicil; and other illustrations might be given.

These differences, however, cannot affect our conclusion here, which, under the circumstances, accords with that of the Supreme Court of Kansas.

*Judgment affirmed.*