STATE OF MAINE *vs.* CHESTER SAWYER.

Hancock.    Opinion July 21, 1915.

*Close Time.    Congress of United States.    Federal Constitution.    Game Laws.
Jurisdiction.    Migratory Game Birds.    Regulations.*

1.  The fish in the waters of the State and the game in the forests belong to the
    people of the State in their sovereign capacity, who, through their representa-
    tives, the legislature, have sole control thereof and may permit or prohibit
    their taking.
2.  The power to legislate respecting the protection and preservation of wild
    game within the States was not conferred upon Congress through the commerce
    clause of the Constitution.
3.  The ownership of wild game, so far as it is capable of ownership, is in the
    States for the benefit of all their people in common.
4.  Congress therefore acquired no power under the general welfare clause of
    the Constitution to make regulations concerning wild game, because wild
    game is not "property belonging" to the United States.
5.  The power of the State of Maine to enact laws and regulations for the pro-
    tection and preservation of wild game within her borders, including migratory
    game birds, was in no way suspended or abridged by the Act of Congress of
    March 4, 1913.
6.  The provision of the game laws of the State of Maine, which the respondent
    violated, was operative and enforceable against him.

On report.    Judgment of lower court affirmed.

This is a criminal prosecution upon complaint and warrant issued
by the Bar Harbor Municipal Court against the respondent for
shooting two migratory game birds on Sunday, October 4, 1914.
The respondent pleaded that he was not guilty.    The court found
him guilty and sentenced him to pay a fine of fifteen dollars and costs
of prosecution.    From this sentence, the respondent appealed to the
Supreme Judicial Court for Hancock County.    The case was reported
to the Law Court upon an agreed statement of facts, by agreement of
parties, for determination.

The case is stated in the opinion.

*Herbert L. Graham*, County Attorney, for the State.

*George R. Hadlock*, for respondent.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, HANSON, JJ.

KING, J. The respondent was tried before the Bar Harbor Municipal Court and found guilty of shooting two migratory game birds or wild ducks on Sunday, October 4, 1914, in violation of a provision of the fish and game laws of the State of Maine. He appealed and the case is reported to this court on an agreed statement of facts. The alleged offense was committed while the respondent was in a boat on the open sea one-fourth of a mile from Baker's Island which forms a part of the town of Cranberry Isles, Hancock County, Maine.

It is not contended that the respondent did not violate a law of the State prohibiting the killing of wild ducks, for Sunday is a closed time when it is unlawful to hunt, kill or destroy game or birds of any kind, under the penalties imposed therefor during other closed seasons, Chap. 206, P. L., 1913, Sec. 50, and there is an annual closed season on all varieties of ducks from January 1 to August 31 of each year, with a specified penalty for its violation, Sec. 43, Chap. 206, supra. Nor is it contended, as we understand the agreed statement, that the place where the act was committed is not within the State of Maine, for it was only one-fourth of a mile from an island "within its jurisdiction." It is claimed, however, that any power which the States had to make and enforce laws and regulations concerning the killing of migratory game birds became suspended and inoperative by reason of the Act of Congress of March 4, 1913, and the regulations thereunder. That Act contains the following provisions:

"All wild geese, wild swans, brant, wild ducks, snipe, plover, woodcock, rail, wild pigeons, and all other migratory game and insectivorous birds which in their northern and southern migrations pass through or do not remain permanently the entire year within the borders of any State or Territory, shall hereafter be deemed to be within the custody and protection of the Government of the United States, and shall not be destroyed or taken contrary to regulations hereinafter provided therefor.

The Department of Agriculture is hereby authorized and directed to adopt suitable regulations to give effect to the previous paragraph by prescribing and fixing closed seasons, having due regard to the zones of temperature, breeding habits, and times and line of migratory flight, thereby enabling the department to select and designate

suitable districts for different portions of the country, and it shall be unlawful to shoot or by any device kill or seize and capture migratory birds within the protection of this law during said closed seasons, and any person who shall violate any of the provisions or regulations of this law for the protection of migratory birds shall be guilty of a misdemeanor and shall be fined not more than $100 or imprisoned not more than 90 days, or both, in the discretion of the court.

The Department of Agriculture, after the preparation of said regulations, shall cause the same to be made public, and shall allow a period of three months in which said regulations may be examined and considered before final adoption, permitting, when deemed proper, public hearings thereon, and after final adoption shall cause the same to be engrossed and submitted to the President of the United States for approval: Provided, however, That nothing herein contained shall be deemed to affect or interfere with the local laws of the States and Territories for the protection of non-migratory game or other birds resident and breeding within their borders, nor to prevent the States and Territories from enacting laws and regulations to promote and render efficient the regulations of the Department of Agriculture provided under this statute."

In pursuance of the authority of the Act the Department of Agriculture adopted suitable regulations which have been approved by the President, one of which fixes a closed season on wild ducks in Maine between December 16 and September 1 next following.

If Congress had the power to control and regulate the killing of migratory game birds within the State, and if in the exercise of that power it has made regulations that are exclusive of, or in conflict with, the State regulations, then the federal regulations must be regarded as supreme, and to have suspended the power of the State to make and enforce regulations respecting the same subject matter.

The federal Act provides that wild ducks and other specified migratory game birds "shall hereafter be deemed to be within the custody and protection of the Government of the United States, and shall not be destroyed contrary to the regulations hereinafter provided for." This language indicates a legislative purpose that the federal regulations were to be exclusive. And this idea seems to be further indicated in the provision, "That nothing herein contained shall be deemed to affect or interfere with the local laws of the States and Territories for the protection of non-migratory game or other birds

resident and breeding within their borders, nor to prevent the States and Territories from enacting laws and regulations to promote and render efficient the regulations of the Department of Agriculture provided under this statute." We do not, therefore, feel inclined to hold in this case that the federal regulations as to migratory game birds, *if valid,* are not to be regarded as exclusive of and in conflict with the State regulations which the respondent violated. Accordingly it becomes necessary we think to consider, whether the Act of Congress of March 4, 1913 and the regulations thereunder adopted are valid as against the State regulations for the preservation of wild ducks within its borders.

Notwithstanding the well recognized principle, that the authority to make a final and controlling determination of the question of the constitutionality of an Act of Congress is in the Supreme Court of the United States, and for that reason a State court does not ordinarily assume the consideration of such question, nevertheless, if, as in this case, before that question is finally decided by the Supreme Court, the enforcement of a State law depends upon whether Congress had power under the Constitution to pass an Act the effect of which is to suspend the State law, then it becomes the duty of the State court to act in accordance with its own decision of that question until such time at least as it may be otherwise finally determined by the supreme tribunal.

In considering this question, these fundamental and universally admitted principles should be kept in mind, that the federal government is one of enumerated powers, possessing such powers only as have been actually granted to it, and that all other powers of legislation, though not enumerated and defined because it was unnecessary and perhaps inexpedient that they should be, were retained by the States and remained in the States after the adoption of the federal Constitution as before, except so far as they were abridged by it. It must also be admitted as fundamental, that before the federal government was created the States had the right to exercise almost every legislative power, and among them, undoubtedly, that of establishing laws and regulations for the preservation of the wild game within their borders for the common good of their people, a doctrine which seems never to have been questioned in any jurisdiction.

In *State* v. *Snowman,* 94 Maine, 99, 111, our court said: "The fish in the waters of the State and the game in the forests belong to the people of the State in their sovereign capacity who, through their representatives, the legislature, have sole control thereof and may permit or prohibit their taking." This doctrine is recognized by all the American courts and has had the uniform approval of the Supreme Court of the United States whenever the question has been considered by it. In *Geer* v. *Connecticut,* 161 U. S., 519, the leading case perhaps on the subject, Mr. Justice White (now the Chief Justice) learnedly analyzed the principles upon which this doctrine rests and exhaustively reviewed the precedents in which it is securely established. And it would be needless indeed to cite here the many authorities supporting this unquestioned principle, that the States, prior to the formation of the national legislature, had the power to make laws and regulations for the protection and preservation of the wild game within their borders.

Has that power been granted to the federal government? If so it must be found in either what is called the commerce clause, or the general welfare clause, of the federal Constitution.

The commerce clause authorizes Congress, "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Certainly the passage of wild birds in their flight from one State to another is not commerce between the States. However difficult it may be to define with precision the term commerce as used in that clause of the national Constitution, it is undoubtedly limited to the acts of man, and does not include the natural and uncontrolled movements of wild game. Nor can we perceive any reasonable ground for a contention that the commerce clause confers on Congress power to regulate the taking of wild game within the States. Indeed it would seem that all possible contention on this score has been already held untenable by the Supreme Court of the United States in several cases where the question has been exhaustively considered. In the case of *Geer* v. *Connecticut,* supra, the validity of a statute of that State, which prohibited the transportation of game out of the State, was involved. The case was carried to the Supreme Court of the United States on the sole ground that as the game in question was killed in the State lawfully, the statute prohibiting its transportation out of the State was in violation of the commerce clause of the national Constitution. But the Court

decided otherwise, holding that the wild animal and bird life within a State belongs to the State in trust for the people of the State, and that the State has the authority to legislate for its protection and preservation for the common good, and that such power of legislation embraces game that has been reduced to the possession of an individual by lawfully killing it in the State; or, in other words, that in view of the peculiar nature of such property and its ownership by the State for the benefit of all its citizens, the State may prohibit its transportation out of the State although lawfully killed within the State, because such a prohibition may tend to restrict its lawful killing within the State, and the better preserve it for its own people. And it was there held that while game, taken lawfully, might be considered a subject of commerce within the State where taken, it did not become the subject of interstate commerce within the commerce clause of the federal Constitution. See also *New York Ex Rel. Silz* v. *Hesterberg,* 211 U. S., 34, where it is held that a statute of New York prohibiting the possession of certain game during closed time did not violate the commerce clause of the federal Constitution. In Judson on Interstate Commerce, Sec. 11, the author says: "Thus the wild game within a State, at common law, belongs to the sovereign, and in this country to the people in their collective capacity, and the state, therefore, has a right to say that it shall not become the subject of commerce." Our conclusion therefore is that the power to legislate respecting the protection and preservation of wild game within the States was not conferred upon Congress through the commerce clause of the Constitution.

Nor do we find such power in the general welfare clause, which reads as follows: "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be construed as to prejudice any claims of the United States, or of any particular state."

We have already hereinbefore pointed out as the universally accepted doctrine, that the ownership of wild game, so far as it is capable of ownership, is in the States for the benefit of all their people in common. It follows, therefore, that Congress acquired no power under the general welfare clause to make regulations concerning wild game, because wild game is not "property belonging" to the United States. And we need here only repeat what has been before said in

substance, that the basic principle on which all the decisions of both the State and Federal Courts upholding the State game laws rest is, that the State is the owner of the wild game within its borders, and that principle has been consistently adhered to.

The question of the constitutionality of the Act of March 4, 1913 and the regulations thereunder, has been directly considered in two recent cases in the Federal Courts, viz: *United States* v. *Shauver*, 214 Fed., 154, decided by the District Court for the Eastern District of Arkansas, and *United States* v. *M'Cullagh*, 221 Fed., 288, decided by the District Court for the District of Kansas. In each of those cases, in an exhaustive opinion, the court reaches the same conclusion here reached, that Congress has not the power to regulate the taking of migratory game birds within the States, and that therefore the Act of March 4, 1913, is unconstitutional. In each of those cases the respondent was prosecuted in the Federal Court for a specific violation of the federal regulations.

Our conclusion therefore is, that the power of the State of Maine to enact laws and regulations for the protection and preservation of wild game within her borders, including migratory game birds, was in no way suspended or abridged by the Act of Congress of March 4, 1913, and the regulations adopted thereunder, and that the provision of the game laws of the State of Maine which the respondent violated was operative and enforceable against him.

There is no merit in the respondent's suggestion that because the warrant against him in this case was directed to a fish warden and served by him the proceedings were defective. Fish wardens are empowered by statute to "enforce all laws and the rules and regulations relating to sea and shore fisheries, arrest all violators thereof, and prosecute all offenses against the same; they shall have the same power to serve criminal processes against such offenders, and shall be allowed the same fees, as sheriffs for like services; they shall have the same right as sheriffs to require aid in executing the duties of their office."

Sec. 45, of Chap. 206, Public Laws, 1913, reads as follows:

"The general supervision of the department of sea and shore fisheries as heretofore fixed by law is hereby extended to embrace all the islands in the sea within the jurisdiction of the state, the deer and other game and birds found thereon, and said department shall have charge of the enforcement of the laws relating to all ducks, shore and

other birds on the sea-coast of the state one mile inland, including all bays and inlets so far as the tide ebbs and flows, except the Kennebec river above the city of Bath."

We entertain no doubt that the fish warden to whom the warrant against the respondent was directed and by whom it was served had ample authority conferred upon him by statute to act in the premises.

*Judgment of lower court affirmed.*