## UNITED STATES v. THOMPSON.

(District Court, E. D. Arkansas, Jonesboro Division. June 4, 1919.)

1. TREATIES ⊕⟹2—POWER TO MAKE—CONSTITUTIONAL PROVISIONS.

The Constitution limits legislation by Congress to matters within the scope of the powers expressly delegated therein to the federal government, but treaties are not so limited; Const. art. 6, cl. 2, providing that "this Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land."

2. TREATIES ⊕⟹4—SCOPE AND VALIDITY—STATUTE TO GIVE EFFECT TO TREATY.

A treaty relating to a proper subject of international negotiation, which is not in conflict with any constitutional provision, nor subversive of fundamental rights, is valid, and may be made effective by appropriate legislation, although, if it were a statute, it would be unconstitutional, as affecting rights exclusively under control of the states.

3. GAME ⊕⟹4—MIGRATORY BIRD ACT—CONSTITUTIONALITY.

Migratory Bird Act July 3, 1918 (Comp. St. 1918, §§ 8837a–8837m), enacted to give effect to the convention between the United States and Great Britain of August 16, 1916, *held* valid.

Criminal prosecution by the United States against E. D. Thompson. On demurrer to information. Overruled.

W. H. Martin, U. S. Atty., of Hot Springs, Ark., Wm. L. Frierson, Asst. Atty. Gen., and Wm. W. Williams, Solicitor of Department of Agriculture, for the United States.

S. W. Moore, of Kansas City, Mo., and E. L. Westbrook, of Jonesboro, Ark., for defendant.

TRIEBER, District Judge. The issue in this cause, raised by demurrer to an information filed by the United States attorney, charging the defendant with a violation of the Migratory Bird Act of July 3, 1918 (40 Stat. 755, c. 128, U. S. Comp. St. 1918, p. 1795), entitled: "An act to give effect to the convention between the United States and Great Britain for the protection of migratory birds, concluded at Washington, August 16, 1916, and for other purposes" (the treaty referred to will be found in 39 Stat. 1702), is whether the act is constitutional. This, of course, involves the power to make the treaty.

The contention of counsel for the defendant, briefly stated, is that a treaty or convention between the United States and a foreign nation is of no higher grade than an act of Congress, and if an act of Congress regulating migratory birds is beyond the constitutional powers of Congress a treaty on the same subject is also void.

The constitutional provisions relating to the treaty power are: Article 2, § 2, cl. 2, which, among the powers granted to the President, provides that:

"He shall have power, by and with the * * * consent of the Senate, to make treaties: Provided, two-thirds of the Senators present concur."

Article 1, § 10, cl. 1, provides that:

"No state shall enter into any treaty, alliance or confederation."

The Tenth Amendment to the Constitution provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

It is now contended that as it was held by this court in United States v. Shauver (D. C.) 214 Fed. 154, by Judge Pollock in U. S. v. McCullagh (D. C.) 221 Fed. 288, and in State v. Sawyer, 113 Me. 458, 94 Atl. 886, L. R. A. 1915F, 1031, Ann. Cas. 1917D, 650, and State v. McCullagh, 96 Kan. 786, 153 Pac. 557, that the migratory bird section of the Appropriation Act for the Department of Agriculture of March 4, 1913, c. 145, 37 Stat. 828, 847 (Comp. St. § 8837), was unconstitutional, the same result must follow in this case; or, in other words, that the treaty power under the Constitution is no greater than the power of Congress to enact statutes. (The act of 1913 was not enacted to carry into effect a treaty.)

In construing the Constitution it is the settled canon of construction that every part of it must be given effect, and none of its provisions may be disregarded. Article 6, cl. 2, of the Constitution, provides:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

It will be noticed that this section, in speaking of the laws of the United States, limits the power to enact them to such laws as are "made in pursuance thereof." On the other hand, when referring to treaties, the only limitation is "which shall be made under the authority of the United States," omitting the words "in pursuance of the Constitution." It cannot be assumed that the framers of that instrument intended to make no distinction between laws and treaties, when using language differing so materially. The words, "laws made in pursuance of the Constitution," can have but one meaning, namely, when authorized by the Constitution, while as to treaties the limitation is when made "by authority of the United States." The reason for this distinction is obvious. In making laws, our own consent alone, is necessary, but in forming treaties the concurrence of the other power to the treaty is required.

Laws can only prescribe the conduct for the people within the jurisdiction of the lawmaker, while treaties are to affect rights and privileges of subjects of foreign countries and of our citizens in such countries. Treaties are reciprocal, and in all instances the same rights and privileges are granted to the citizens and subjects of each of the contracting parties in the respective countries.

Laws of a local nature, and which, under our dual system of government, are under the exclusive control of the states, frequently affect the most important rights of aliens, while the rights of our own citizens are similarly affected by the municipal laws of foreign nations. To protect these, treaties must be made, and as the states are expressly prohibited by the Constitution from entering into treaties with foreign nations, these rights can only receive the protection necessary for their

enjoyment by treaties made by the national government, clothed with that power by our Constitution. As held in the Chinese Exclusion Case, 130 U. S. 581, 604, 605, 9 Sup. Ct. 623, 629 (32 L. Ed. 1068):

"While under our Constitution and form of government the great mass of local matters is controlled by local authorities, the United States, in their relation to foreign countries and their subjects or citizens are one nation, invested with powers which belong to independent nations, the exercise of which can be invoked for the maintenance of its absolute independence and security throughout its entire territory. The powers to declare war, make treaties, suppress insurrection, repel invasion, regulate foreign commerce, secure republican governments to the states, and admit subjects of other nations to citizenship, are all sovereign powers, restricted in their exercise only by the Constitution itself, and considerations of public policy and justice, which control, more or less, the conduct of all civilized nations. * * * The control of local matters being left to local authorities, and national matters being entrusted to the government of the Union, the problem of free institutions existing over a widely extended country, having different climates and varied interests, has been happily solved. For local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power."

Attorney General Cushing, in Droit D'Aubaine, 8 Op. Attys. Gen. 411, 415, said:

"But can it be, is there any good reason to think, that the federal government has no power to make such a stipulation? It may be inconvenient, because involving conflict with, or abrogation of, the laws of one or more of the states. Granted; but inconvenience is not unconstitutionality, question of which depends on the text of the federal Constitution. The power, which the Constitution bestows on the President, with advice and consent of the Senate, to make treaties, is not only general in terms and without any express limitation, but it is accompanied with absolute prohibition of exercise of treaty power by the states. That is, in the matter of foreign negotiation, the states have conferred the whole of their power—in other words, all the treaty powers of sovereignty—on the United States. Thus, in the present case, if the power of negotiation be not in the United States, then it exists nowhere, and one great field of international relation, of negotiation, and of ordinary public and private interest, is closed up, as well against the United States as each and every one of the states. That is not a supposition to be accepted, unless it be forced upon us by considerations of overpowering cogency. Nay, it involves political impossibility; for, if one of the proper functions of sovereignty be thus utterly lost to us, then the people of the United States are but incompletely sovereign—not sovereign, nor in coequality of right with other admitted sovereignties of Europe and America."

Mr. Richard Henry Lee, writing under the pen name of "The Federal Farmer," in his letter IV, dated October 12, 1787, when the Constitution was before the people of the states for ratification, speaking of the treaty-making power in the Constitution, said:

"By the article before recited, treaties also made under the authority of the United States shall be the supreme law. It is not said that these treaties shall be made in pursuance of the Constitution, nor are there any constitutional bounds set to those who shall make them. The President and two-thirds of the Senate will be empowered to make treaties indefinitely, and, when these treaties shall be made, they will also abolish all laws and state Constitutions incompatible with them. This power in the President and Senate is absolute, and the judges will be bound to allow full force to whatever rule, article, or thing the President and Senate shall establish by treaty. Whether it be practicable to set any bounds to those who make treaties, I am not able to say; if not, it proves that this power ought to be more safely lodged." Scott's Federalist and Other Constitutional Papers, vol. 2, pp. 867, 868.

Mr. Iredell, later one of the Justices of the Supreme Court, and the only justice who dissented in Ware v. Hylton, 3 U. S. (3 Dall.) 199, 1 L. Ed. 568, in his answer to Mr. Mason's objections to the Constitution, referring to the treaty power said:

"Did not Congress very lately unanimously resolve, in adopting the very sensible letter of Mr. Jay, that a treaty, when once made pursuant to the sovereign authority, ex vi termini became immediately the law of the land? It seems to result unavoidably from the nature of the thing that, when the constitutional right to make treaties is exercised, the treaty so made should be binding upon those who delegated authority for that purpose. If it was not, what foreign power would trust us? And if this right was restricted by any such fine checks as Mr. Mason has in his imagination, but has not thought proper to disclose, a critical occasion might arise, when for want of a little rational confidence in our own government we might be obliged to submit to a master in an enemy." Scott's Federalist and Other Constitutional Papers, vol. 2, p. 903.

Mr. Calhoun, while the commercial treaty with Great Britain was being discussed in the House of Representatives, on January 8, 1816, said:

"This country within is divided into two distinct sovereignties. Exact enumeration here is necessary to prevent the most dangerous consequences. The enumeration of legislative powers in the Constitution has relation, then, not to the treaty-making power, but to the powers of the states. In our relation to the rest of the world, the case is reversed. Here the states disappear. Divided within, we present, without, the exterior of undivided sovereignty. The wisdom of the Constitution appears conspicuous. When enumeration was needed, there we find the powers enumerated and exactly defined; when not, we do not find what would be vain and pernicious to attempt. Whatever, then, concerns our foreign relations, whatever requires the consent of another nation, belongs to the treaty power, can only be regulated by it; and it is competent to regulate all such subjects, provided—and here are its true limits—such regulations are not inconsistent with the Constitution. If so, they are void. No treaty can alter the fabric of our government; nor can it do that which the Constitution has expressly forbidden to be done; nor can it do that differently which is directed to be done in a given mode, and all other modes prohibited." 4 Elliott's Debates, p. 464.

The power to make treaties has been frequently before the Supreme Court, and there is not a single instance in which a treaty has been declared unconstitutional, although many of them affect rights exclusively under the control of the states, and, if enacted as statutes by Congress, would have been void. The first time this question came before the Supreme Court was in Ware v. Hylton, 3 U. S. (3 Dall.) 199, 1 L. Ed. 568, decided in 1796. In that case the question before the court was the effect of the Paris Treaty of Peace, between the United States and Great Britain, made at the close of the war in 1783. The facts in that case were that the defendant, on July 7, 1774, became indebted on a bond, of which the plaintiffs became the owners. In 1777, before the Articles of Confederation had been entered into, the state of Virginia enacted a law to sequester the property of British subjects in the state. A part of this indebtedness was sequestered, and paid to the proper officers of the state. This was pleaded as a bar of so much of the debt as had been paid to the state. The plaintiff, to avoid this bar, pleaded the article of the Treaty of Peace which provided:

"That the creditors of either side should meet with no lawful impediment to the recovery of * * * all bona fide debts theretofore contracted."

It was held that while the state of Virginia had a right in 1777, being then a sovereign state, to enact this confiscation act, the Treaty of Peace nullified it, and the plaintiff was entitled to recover the full amount of the bond. Mr. Justice Chase, who delivered the principal opinion of the court, in the course of it said:

"There can be no limitation on the power of the people of the United States. By their authority, the state Constitutions were made, and by their authority the Constitution of the United States was established: and they had the power to change or abolish the state Constitutions, or to make them yield to the general government, and to treaties made by their authority. A treaty cannot be the supreme law of the land—that is, of all the United States—if any act of a state Legislature can stand in its way. If the Constitution of a state (which is the fundamental law of the state, and paramount to its Legislature) must give way to a treaty, and fall before it, can it be questioned whether the less power, an act of the state Legislature, must not be prostrated? It is the declared will of the people of the United States that every treaty made by the authority of the United States shall be superior to the Constitution and laws of any individual state; and their will alone is to decide. If a law of a state, contrary to a treaty, is not void, but voidable only, by a repeal, or nullification by a state Legislature, this certain consequence follows: That the will of a small part of the United States may control or defeat the will of the whole. The people of America have been pleased to declare that all treaties made before the establishment of the national Constitution, or laws of any of the states contrary to a treaty, shall be disregarded."

In Hopkirk v. Bell, 7 U. S. (3 Cranch) 454, 2 L. Ed. 497, and 8 U. S. (4 Cranch) 164, 2 L. Ed. 583, which involved a state statute of limitations, a subject clearly within the exclusive jurisdiction of the states, in actions between individuals, it was held that the state statute must give way to the treaty.

In Chirac v. Chirac, 15 U. S. (2 Wheat.) 259, 4 L. Ed. 234, the question before the court was the effect of the Treaty of 1800, with France, on a statute of the state of Maryland, which provided:

"Whenever any French subject shall, by virtue of the act [which permitted French subjects to inherit real estate in the state] become seised in fee of real estate, his or her estate, after the term of ten years be expired, shall vest in the state, unless the person seised of the same, shall, within that time, either come or settle in and become a citizen of this state, or enfeoff thereof some citizen of this or some other of the United States of America."

The Treaty of 1800 enabled the people of each of the contracting parties to hold inherited lands in the other country, without being obliged to obtain letters of naturalization, and it was held that the treaty controlled, although the law is well settled that the laws of acquiring and owning lands are under the exclusive control of the states. Other cases to the same effect are Fairfax v. Hunter, 11 U. S. (7 Cranch) 603, 3 L. Ed. 453; Craig v. Radford, 16 U. S. (3 Wheat.) 594, 4 L. Ed. 467; Levy v. McCartee, 31 U. S. (6 Pet.) 102, 8 L. Ed. 334; United States v. Fox, 94 U. S. 315, 320, 24 L. Ed. 192; Clarke v. Clarke, 178 U. S. 186, 191, 20 Sup. Ct. 873, 44 L. Ed. 1028; Hutchinson Investment Co. v. Caldwell, 152 U. S. 65, 68, 14 Sup. Ct. 504, 38 L. Ed. 356.

In Hauenstein v. Lynham, 100 U. S. 483, 25 L. Ed. 628, it was held that the statutes of Virginia, under which aliens were incapable of taking lands by descent or inheritance, must give way to the treaty with

Switzerland.   One of the most important opinions is that of Mr. Justice Field, in Geofroy v. Riggs, 133 U. S. 258, 266, 267, 10 Sup. Ct. 295, 296, 297 (33 L. Ed. 642).   It was there held:

"That the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations is clear.   *   *   *   The treaty power, as expressed in the Constitution, is in terms unlimited, except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the states.   It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the states, or a cession of any portion of the territory of the latter, without its consent.   Ft. Leavenworth Railroad Co. v. Lowe, 114 U. S. 525, 541 [5 Sup. Ct. 995, 29 L. Ed. 264].   But with these exceptions it is not perceived that there is any limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country."

It will be noticed that he expressed the opinion that some limitations on that power exist, and, although this was clearly obiter, it is entitled to high consideration.

In Baldwin v. Franks, 120 U. S. 678, 682, 7 Sup. Ct. 656, 657 (32 L. Ed. 766), one of the questions before the court was whether Congress could enact legislation for the protection of subjects of China, while in the United States, in order to secure to them the same rights and privileges, etc., as may be enjoyed by the citizens and subjects of the most favored nations, as the United States had obligated itself to do by the treaty with China although to do so it would have to enact laws ordinarily belonging exclusively to the states.   Mr. Chief Justice Waite, speaking for the court, said:

"That the treaty-making power has been surrendered by the states, and given to the United States, is unquestionable.   It is true, also, that the treaties made by the United States and in force are part of the supreme law of the land, and that they are as binding within the territorial limits of the states as they are elsewhere throughout the dominion of the United States."

In Re Ross, 140 U. S. 453, 463, 11 Sup. Ct. 897, 900 (35 L. Ed. 581), it was held:

"The treaty-making power vested in our government extends to all proper subjects of negotiation with foreign governments.   It can, equally with any of the former or present governments of Europe, make treaties providing for the exercise of judicial authority in other countries by its officers appointed to reside therein."

In Re Parrott (C. C.) 1 Fed. 481, it was held that the provision in the Constitution of the state of California (article 19, § 2):

"No corporation now existing or hereafter formed under the laws of this state shall, after the adoption of this Constitution, employ, directly or indirectly, in any capacity, any Chinese or Mongolian.   The Legislature, shall pass such laws as may be necessary to enforce this provision"

—and the statutes of the state in pursuance thereof, being in conflict with the treaty of the United States with China, are void.   In that case it was claimed that the act attacked was within the reserved powers of the state, for the control of the corporations created by it; but the court held:

"Even if the reserved power of the state over corporations were as exten‑ sive as is claimed, its exercise in the manner attempted in this case would be invalid, because in conflict with the treaty."

The right of a state to discriminate against nonresidents to act as executors and administrators of the estates of deceased residents within the state is undoubted, yet it has been held that if, by a treaty of the United States with a foreign nation, the right to act as the administrator of the estate of a deceased person, who was the subject or citizen of the foreign treaty nation, is granted to the consul of that nation in this country, he may act as such administrator notwithstanding the prohibition of the state law. In Fattosini's Estate, 33 Misc. Rep. 18, 67 N. Y. Supp. 1119; In re Lobrasciano's Estate, 38 Misc. Rep. 415, 77 N. Y. Supp. 1040; In re Wyman, 191 Mass. 276, 77 N. E. 379, 114 Am. St. Rep. 601; Carpigiani v. Hall, 172 Ala. 287, 55 South. 248, Ann. Cas. 1913D, 651; In re Scutella's Estate, 145 App. Div. 156, 129 N. Y. Supp. 20. In Rocca v. Thompson, 223 U. S. 317, 32 Sup. Ct. 207, 56 L. Ed. 453, this question was mooted, but not decided, as the court construed the treaty as not granting that right. In Wildenhus' Case, 120 U. S. 17, 7 Sup. Ct. 390, 30 L. Ed. 565, the Chief Justice, delivering the unanimous opinion of the court, held:

"The treaty is a part of the supreme law of the United States, and has the same force and effect in New Jersey that it is entitled to elsewhere. If it gives the consul of Belgium exclusive jurisdiction over the offense which it is alleged has been committed [the offense charged was murder], within the territory of New Jersey, we see no reason why he may not enforce this right under the treaty by writ of habeas corpus in any proper court of the United States."

To subject the treaty power to all the limitations of Congress in enacting the laws for the regulations of internal affairs would in effect prevent the exercise of many of the most important governmental functions of this nation, in its intercourse and relations with foreign nations, and for the protection of our citizens in foreign countries. The states of the Union may enact all laws necessary for their local affairs, not prohibited by the national or their own Constitution; but they are expressly prohibited from entering into treaties, alliances, or confederations with other nations. If, therefore, the national government is also prohibited from exercising the treaty power, affecting matters which for internal purposes belong exclusively to the states, how can a citizen be protected in matters of that nature when they arise in foreign countries?

The same liberal construction has been applied to treaties made with Indians. In United States v. Forty-Three Gallons of Whisky, 93 U. S. 188, 197, 23 L. Ed. 846, article 3 of the treaty of October, 1863, between the United States and the Red Lake Band of Chippewa Indians, was involved. That article was:

"The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, shall be in full force and effect through the country hereby ceded, until otherwise directed by Congress or the President of the United States."

It was contended that the treaty was invalid, so far as it attempted to extend it to an organized county in the state of Minnesota; that the treaty provided regulations, which the national government could not constitutionally impose, and was to that extent unconstitutional. But the Supreme Court overruled this contention, saying:

"Besides, the power to make treaties with Indian tribes is, as we have seen, coextensive with that to make treaties with foreign nations. In regard to the latter, it is, beyond doubt, ample to cover all the usual subjects of diplomacy, one of them relates to the disability of the citizens and subjects of either contracting nation to take, by descent or devise, real property situated in the territory of the other. If a treaty to which the United States is a party removed such disability, and secured to them the right so to take and hold such property, as if they were natives of this country, it might contravene the statutes of the states; but in that event the courts would disregard them, and give to the alien the full protection conferred by its provisions."

In United States v. Winans, 198 U. S. 371, 25 Sup. Ct. 662, 49 L. Ed. 1089, a treaty with the Yakima Indians, granting them certain fishing rights in the Columbia river, was held constitutional, and the law of the state authorizing the granting of exclusive licenses to place fish wheels at points on the Columbia river, notwithstanding the admission of the state upon an equal footing with the original states, was held void, so far as it applied to the Indians.

Even in matters of a purely local nature, Congress, if the Constitution grants it plenary powers over the subject, may exercise what is akin to the police power, a power ordinarily reserved to the states. Thus, under the commerce clause of the Constitution, many acts of Congress have been sustained. The White Slavery Act (Act June 25, 1910, c. 395, 36 Stat. 825 [Comp. St. §§ 8812–8819]), Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905; the Food and Drug Act (Act June 30, 1906, c. 3915, 34 Stat. 768 [Comp. St. §§ 8717–8728]), Seven Cases v. United States, 239 U. S. 510, 36 Sup. Ct. 190, 60 L. Ed. 411, L. R. A. 1916D, 164; the Webb-Kenyon Act (Act March 1, 1913, c. 90, 37 Stat. 699 [Comp. St. § 8739]), Clarke Distilling Co. v. Western Maryland Railway Co., 242 U. S. 311, 37 Sup. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845. Under the taxing power, acts of Congress have been sustained which in effect deprived the states of some of their powers. Veazie Bank v. Fenno, 75 U. S. (8 Wall.) 533, 19 L. Ed. 482; McCray v. United States, 195 U. S. 27, 24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Flint v. Stone Tracy Co., 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312.

The power to control the laws of evidence in its courts ordinarily belongs exclusively to the states, but in Pugh v. McCormick, 81 U. S. (14 Wall.) 361, 372, 20 L. Ed. 789, it was held that as the acts of Congress of 1862, 1863, and 1864 required all notes to have affixed a revenue stamp, under penalty of their being, when sued on, held void, controlled state legislation, and to permit an unstamped instrument to be read in evidence in a court of the state, while these acts were in force, was held to be error.

Attorney General Griggs, in his opinion to the Secretary of State on the power of the United States to enter into treaty stipulations with

Great Britain for the regulation of fisheries in the waters of the United States and Canada, along the international boundary, said that, while "the regulation of fisheries in navigable waters within the territorial limits of the several states, in the absence of a federal treaty is a subject of state rather than of federal jurisdiction," it is no objection to the validity of a treaty, which supersedes and annuls the law of a particular state upon the same subject. Treaties—Fisheries, 22 Op. Attys. Gen. 214. See, also, the memorandum prepared by Mr. Charles Henry Butler, on the treaty power, relative to the protection of fisheries within the boundaries of the states, submitted to the Anglo-American Joint High Commission, October, 1898. 2 Butler on Treaty-Making Power of the United States, p. 315.

It is a well-known fact that the first 10 amendments to the Constitution were submitted and adopted to allay the fears expressed by many that, under the powers granted to Congress, it may exercise them so as to deprive the states from enacting legislation of a purely local nature, centralize all powers in Congress, and practically reduce the states to mere provinces. No such fears were expressed, either in the convention which framed the Constitution or in any of the state conventions called to act on it, so far as it affected the treaty power. This is all-important, for, as said in the Legal Tender Cases, 79 U. S. (12 Wall.) 457, 531, 20 L. Ed. 287:

"Nor can it be questioned that, when investigating the nature and extent of the powers conferred by the Constitution upon Congress, it is indispensable to keep in view the objects for which those powers were granted. This is a universal rule of construction, applied alike to statutes, wills, contracts, and Constitutions. If the general purpose of the instrument is ascertained, the language of its provisions must be construed with reference to that purpose, so as to subserve it. In no other way can the intent of the framers of the instrument be discovered. And there are more urgent reasons for looking to the ultimate purpose in examining the powers conferred by a Constitution than there are in construing a statute, a will, or a contract. We do not expect to find in a Constitution minute details. It is necessarily brief and comprehensive. It prescribes outlines, leaving the filling up to be deduced from the outlines."

In the same case, Mr. Justice Bradley, in his concurring opinion, said:

"The United States is not only a government, but it is a national government, and the only government of this country that has the character of nationality. It is invested with power over all the foreign relations of the country, war, peace, negotiations, and intercourse with other nations; all of which are forbidden to the state governments." 79 U. S. (12 Wall.) 555, 20 L. Ed. 287.

To hold that this amendment is a limitation on the treaty power to the same extent as it is on acts of Congress, acts purely local, would in effect nullify the treaty power.

We may well apply to the treaty power what was said by Mr. Chief Justice White in the Selective Draft Law Cases, 245 U. S. 366, 381, 38 Sup. Ct. 159, 162 (62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856):

"When the Constitution came to be framed it may not be disputed that one of the recognized necessities for its adoption was the want of power in Con-

gress to raise an army and the dependence upon the states for their quotas. In supplying the power, it was manifestly intended to give it all, and leave none to the states, since, besides the delegation to Congress of authority to raise armies, the Constitution prohibited the states, without the consent of Congress, from keeping troops in time of peace or engaging in war. Article I, § 10."

A careful analytical examination of the authorities cited in behalf of the defendant convinces that they are wholly inapplicable. In Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956, the contention was that:

"All legislative power must be vested in either the state or the national government; no legislative powers belong to a state government, other than those which affect solely the internal affairs of that state; consequently all powers which are national in their scope must be found vested in the Congress of the United States."

This the court held to be "in direct conflict with the doctrine that this is a government of enumerated powers." No question of plenary power to Congress was involved in that case.

Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, Ann. Cas. 1918E, 724, involved the power of Congress to enact what was held to be an attempt to regulate child labor in the states, under the commerce clause. The Head Money Cases, 112 U. S. 580, 598, 5 Sup. Ct. 247, 254 (28 L. Ed. 798), merely held that a later act of Congress supersedes a treaty, a rule of law recognized in every case that question was before the courts. The court said:

"A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress by its declaration that 'this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.' A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined; and when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.

"But even in this aspect of the case there is nothing in this law which makes it irrepealable or unchangeable. The Constitution gives it no superiority over an act of Congress in this respect, which may be repealed or modified by an act of a later date. Nor is there anything in its essential character, or in the branches of the government by which the treaty is made, which gives it this superior sanctity.

"A treaty is made by the President and the Senate. Statutes are made by the President, the Senate, and the House of Representatives. The addition

of the latter body to the other two in making a law certainly does not render it less entitled to respect in the matter of its repeal or modification than a treaty made by the other two. If there be any difference in this regard, it would seem to be in favor of an act in which all three of the bodies participate. And such is, in fact, the case in a declaration of war, which must be made by Congress, and which, when made, usually suspends or destroys existing treaties between the nations thus at war.

"In short, we are of opinion that, so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification, or repeal."

In United States v. Jin Fuey Moy, 241 U. S. 394, 401, 36 Sup. Ct. 658, 60 L. Ed. 1061, Ann. Cas. 1917D, 854, the act did not purport to be in aid of or in pursuance of a treaty, as was expressly held by Mr. Justice Holmes in the opinion.

In Ward v. Race Horse, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244, the court merely construed the treaty between the United States and the Indians, and held that the treaty did not grant to the Indians hunting privileges except "in hunting districts." The court said:

"Indeed, it may be further, for the sake of the argument, conceded that where there are rights created by Congress, during the existence of a territory, which are of such a nature as to imply their perpetuity, and the consequent purpose of Congress to continue them in the state, after its admission, such continuation will, as a matter of construction, be upheld, although the enabling act does not expressly so direct. Here the nature of the right created gives rise to no such implication of continuance, since, by its terms, it shows that the burden imposed on the territory was essentially perishable and intended to be of a limited duration."

Patsone v. Pennsylvania, 232 U. S. 138, 34 Sup. Ct. 281, 58 L. Ed. 539, construed a treaty as granting no right to subjects of Italy, to hunt in any of the states of the Union.

Compagnie Française, etc., v. Board of Health, 186 U. S. 380, 395, 22 Sup. Ct. 811, 817 (46 L. Ed. 1209), held that the proper construction of the treaty invoked did not grant the rights claimed. It was held:

"But it is plain from the face of the treaty that the provision as to the certificate was not intended to abrogate the quarantine power, since the concluding section of the article in question expressly subjects the vessel holding the certificate to quarantine detention if, on its arrival, a general quarantine had been established against all ships coming from the port whence the vessel holding the certificate had sailed. In other words, the treaty, having provided the certificate and given it effect under ordinary conditions, proceeds to subject the vessel holding the certificate to quarantine, if, on its arrival, such restriction had been established in consequence of infection deemed to exist at the port of departure. Nothing in the text of the treaty, we think, gives even color to the suggestion that it was intended to deal with the exercise by the government of the United States of its power to legislate for the safety and health of its people, or to render the exertion of such power nugatory by exempting the vessels of the kingdom of Greece, when coming to the United States, from the operation of such laws. In other words, the treaty was made subject to the enactment of such health laws as the local conditions might evoke, not paramount to them, especially where the restriction imposed upon the vessel is based, not upon the conditions existing at the port of departure, but upon the presence of an infectious or contagious malady at the port of arrival within the United States, which, in the nature of things, could not be covered by the certificate relating to the state of the public health at the port whence the ship had sailed."

While this court is of the opinion that the power to declare treaties void, if clearly violative of some provision of the Constitution or for reasons mentioned in Geofroy v. Riggs, exists, it should, in the language of Mr. Justice Chase, in Ware v. Hylton, "never be exercised but in a very clear case indeed."

To make treaties is one of the highest attributes of every sovereign government, and if the United States does not possess it to the fullest extent it would not be invested with the powers which belong to independent nations, and the rights of our citizens in their intercourse with foreign nations, or their right to the protection of life, liberty, and the enjoyment of property in foreign countries would be at the mercy of foreign nations, as the states are without authority to enter into treaties. It is impossible to conceive that the framers of the Constitution overlooked a matter of such importance, and intended to deprive the people of protection in foreign lands, which can only be secured by treaty.

To say that by the exercise of that power the people of the states may be deprived of their liberties is to reflect, not only on those who by the Constitution are invested with that power, but on the people themselves, for a treaty can only be made by the President and the concurrence of two-thirds of the Senators, all elected by the people, and their servants.

Aside from this, a treaty may be repealed by Congress at any time, as there is no principle of law more firmly established by the highest court of the land than that, while a treaty will supersede a prior act of Congress, an act of Congress may supersede a prior treaty. The latest expression controls, whether it be a treaty or an act of Congress. Therefore, if it be conceivable that a President, with the concurrence of two-thirds of the Senators, should make a treaty subversive of the rights and liberties of the people, a Congress would be elected pledged to repeal it.

In the opinion of the court, the power to make the treaty in controversy exists, and the act of Congress to carry it into effect was in discharge of a moral obligation assumed by the nation, by the convention with Great Britain.

The demurrer to the information is overruled. .