## SWETLAND et al. v. CURTISS AIRPORTS CORPORATION et al.

### No. 3023.

District Court, N. D. Ohio, E. D.

July 7, 1930.

[1] 45 S. Ct. 163, 69 L. Ed. 350.

930

Thompson, Hine & Flory, of Cleveland, Ohio, for plaintiffs.

Griswold, Green, Palmer & Hadden and Squire, Sanders & Dempsey, all of Cleveland, Ohio, and Cuthell, Hotchkiss & Mills, of New York City, for defendants.

Elmer McD. Kintz, of Washington, D. C., amicus curiæ.

HAHN, District Judge.

This is an action for an injunction because of alleged trespasses and the alleged maintenance of a nuisance by one or more of the defendants.

Plaintiffs are the owners of a tract of 135 acres located on the west side of Richmond Road in the village of Richmond Heights, Ohio. The defendant Ohio Air Terminals, Inc., a subsidiary of the defendant Curtiss-Wright Corporation, owns a tract of about 272 acres immediately opposite on the east side of Richmond Road. The westerly half of the defendants' property is located in the village of Richmond Heights, Ohio, and the easterly half is located in the village of Mayfield.

Defendants acquired their property for and intend to use it as an airport and flying school.

Plaintiffs' property constitutes the west boundary of defendants' property for 1,434 feet. It extends beyond the defendants' property on the north for 812.59 feet, while defendants' property extends beyond plaintiffs' property to the south 267.68 feet.

Plaintiffs acquired their property about twenty-five years ago. A few years after its acquisition, a substantial country residence and other buildings and conveniences were erected and constructed, so that the property may properly be described as a high-grade, self-contained country estate; the value of the buildings and other improvements, according to the testimony of R. H. Swetland, being approximately $115,000.

At the time when the property was acquired and until the construction of defendants' airport, the entire neighborhood was devoted to farming and residence purposes. There are as yet no railroads, street cars, factories, stores, gasoline stations, or other enterprises of any sort, other than defendants' airport, which create noise or attract crowds in the vicinity. The nearest business, with the exception of defendants' airport, is a gasoline station located at the corner of Richmond and Chardon Heights, about two-thirds of a mile away. The neighborhood is very sparsely settled. For a distance of three miles north and south of the airport on Richmond Road there are only twelve dwellings, some of which are occupied by tenant farmers, and others by the owners of the property; and the, airport and aviation school are so located as to be a minimum annoyance and inconvenience to residents located on the east side of the city of Cleveland, while servicing that city. Most of the property is in a more or less uncultivated condition. The owners seem to be awaiting the time when the growth of the city will absorb their properties.

The main residences upon the Swetland property are located at approximately 250 and 300 feet from the center of Richmond Road and opposite the center of defendants' airport. A repair shop of the defendants will be located a quarter of a mile from the nearest Swetland residence. The warming up of the engines of the airplanes prior to taking off, as required by the regulations of the Secretary of Commerce, will take place on the completed airport at a distance of a quarter of a mile from the nearest Swetland residence.

As the crow is said to fly, the properties in question are located eleven miles east of the city of Cleveland, but the distance over improved roads from the properties to the center of the city of Cleveland is between fourteen and fifteen miles.

Defendants acquired the main tracts of the property which now constitute the airport by deeds dated May 23, 1929, recorded May 28, 1929. On May 27 plaintiff wrote defendant Curtiss Airports Corporation a letter of protest against the proposed use of the property for airport purposes. That letter was acknowledged by Curtiss Airports Corporation by letter dated May 29, 1929. This action was begun on June 1, 1929.

Immediately after acquiring the property, defendants commenced to improve the same for use as an aviation field, and, as soon as temporary runways were installed, some flying was done from this airport. About the middle of December, Curtiss Flying Service commenced the operation of a flying school on the property; not, however, upon an extensive scale. In November, 1929, defendants commenced the erection of a hangar having a capacity of approximately twenty planes. They plan to erect on the property three other similar hangars, one of which will include a service station for airplanes. They will also erect a station for the use of passenger airplanes taking off from the field, or transport planes, and a grand stand for the accommodation of spectators attending exhibitions which the defendants contemplate conducting on the property; also, a gasoline and service station for automobiles. Defendants' plans include a parking space for 460 automobiles. One of these parking spaces is designed to accommodate 250 automobiles, and is located along a strip of land immediately adjacent to Richmond Road and opposite the F. L. Swetland residence.

Without going into an analysis of the evidence, the court finds that some flying has been done by the employees of the defendants at altitudes lower than 500 feet.

The various defendant corporations are all subsidiaries of the so-called Curtiss-Wright Corporation, and the defendant Curtiss Flying Service, Inc., which has been and will be in charge of the flying at defendants' airport, is well equipped, organized, and financed to conduct flying operations from the field in a safe manner; and its disposition is to be of as little annoyance as possible to the plaintiffs. It is the disposition of the defendants to conduct the airport and flying school with the most mod-

ern equipment and appliances. Those in charge of the operation of the airport and the pilots flying therefrom have the highest qualifications. Residents on three sides of the plaintiffs' property have no objection to the operations of the defendants. On the other hand, they seem to welcome the presence of defendants' airport and flying school. Accordingly, it is possible, and the defendants have testified that it is their intention, to conduct none or only a small part of their operations over the property of the plaintiffs. The fact that defendants' property extends 267.68 feet farther south than plaintiffs' makes this in a measure possible.

From the testimony of C. H. Noyes, in charge of the Weather Bureau at Cleveland, it appears that a small percentage of the winds prevailing at the airport are due east or west; that in April and May the prevailing winds are from the northeast; and in June, July, August, September, and October, in the south.

Further facts will be stated later on in this opinion.

A determination of this case requires a decision upon the following points:

(1) Is a private airport and flying school a nuisance per se?

(2) Has the application of the maxim, "Cujus est solum ejus est usque ad cœlum," fixed or established such property rights in a landowner as to make flights over his lands a trespass or a nuisance?

(3) What is the effect of legislation, both national and state, and is it, as applied to this case, a reasonable exercise of the police power?

1. Because of the inventions and activities of the Wright Brothers, at Dayton, Ohio, Ohio regards itself as the mother state of aviation. In the report to the Joint Legislative Committee on Aviation for 1928, eight manufacturers of aircraft in Ohio reported combined capitalization of $5,504,805, employment of 1,655 persons, and production of 987 planes, valued at $4,000,803. Report of the Ohio Director of Aeronautics, 1929, p. 41. The Legislature of Ohio has made adequate provision for municipal airports by providing for the appropriation of real estate within or without the corporate limits of any Ohio municipality. Ohio General Code, § 3677; State ex rel. Chandler v. Jackson, 121 Ohio St. 186, 167 N. E. 396. And the issuance of bonds for that purpose. Ohio General Code, § 3939; State v. City of Cleveland, 26 Ohio App. 265, 160 N. E. 241. As will hereinafter appear, the Legislature of

the State of Ohio, in 1929 (113 Ohio Laws, p. 28), passed a comprehensive act regulating aviation, and the Ohio Legislature is said to have passed the first mandatory act requiring every municipality in the state to be marked for aeronautical purposes. General Code, § 6310—44. It is clearly the legislative policy to encourage aviation.

In view of this declared legislative policy, we have no difficulty in arriving at the conclusion that a private airport, flying school, or landing field such as the defendants propose to operate is not a nuisance per se. It is obvious that although aviation is still to some extent in the experimental stage, it is of great utility in times of peace, and will be a great protection to the nation in times of war. In fact, it is indispensable to the safety of the nation that airports and flying schools such as contemplated by the defendants be encouraged in every reasonable respect. An airport, landing field, or flying school can be regarded as a nuisance only if located in an unsuitable location (Euclid v. Ambler Realty Co., 272 U. S. 365, 388, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; 20 R. C. L. 440; 46 C. J. 666), or if operated so as to interfere unreasonably with the comfort of adjoining property owners. The airport of the defendant here is suitably located; that its location is suitable is evidenced by its surroundings, which we have already set forth, and the almost unanimous consent of adjoining property owners. There has been no protest as to its location except by the plaintiffs and, perhaps, two other persons who testified in their behalf.

It is claimed that certain obnoxious features arise out of the operation of the airport, and it is necessary that we consider them in detail. Complaint is made that there is certain noise arising from the warming up of airplanes and in their operation over the property of the plaintiffs; and noise may be of such a character as to constitute a nuisance. 46 C. J. 683 et seq.; 20 R. C. L. 445. But we are of the opinion that the noise from the operation of the airport, as the evidence shows the defendants will operate it, and the noise of the airplanes when flying at proper altitudes, are not of such a degree as to annoy persons of ordinary sensibilities. Columbus Gaslight & Coke Co. v. Freeland, 12 Ohio St. 392. The noises are less than plaintiffs might be compelled to endure from industrial plants which might properly locate in this locality. Annotation, 23 A. L. R. 1407.

Plaintiffs complain of dust which is blown from the defendants' lands, especially

when airplanes are warming up and taking off from the landing field. 46 C. J. 686. It is clear from the evidence that it is not necessary, in the proper conduct of the airport, that any dust shall arise therefrom. The evidence shows that the necessity of raising dust may be obviated by having concrete runways or runways having a sufficient amount of grass thereon; and the defendants should be required to take these precautions. Plaintiffs are entitled to an injunction enjoining the defendants from permitting dust in substantial and annoying quantities to be blown in the direction of their buildings and grounds.

■ Complaint is also made on the part of the plaintiffs that at various times, particularly on Sundays and holidays, crowds will be attracted to the grounds of the defendants, either at times of exhibitions or on business or as a matter of curiosity. It is, of course, probable that at times crowds will come to the defendants' airport, and it may be, to some extent, annoying to the plaintiffs; but it seems to us that the court would not be justified in enjoining the conduct of the airport on that ground. Courts have refused to do so in similar situations. In this respect the airport comes, to a limited extent, into the same category as places of amusement, which the courts have refused to enjoin merely upon the ground that they may attract crowds of persons. 46 C. J. 690, 692, note 15, 699. In Burroughs v. City of Dallas (C. C. A. 5) 276 F. 812, the court refused to restrain the operation of a scenic railway as a nuisance. No doubt it attracted crowds, at least to the extent to which the defendants' airport will attract crowds. It is, of course, altogether likely that after the novelty of aviation has worn off, curiosity seekers will not so often be attracted to the airport of the defendants.

■ The evidence shows that at one time airplanes of the defendants distributed circulars, many of which fell upon the grounds of the plaintiffs, to their very great annoyance. Such distribution of circulars was an interference with the property rights of the plaintiffs, and they are entitled to an injunction to prevent a repetition of such distribution of circulars.

It appears from the evidence that after the airport has become established, the defendants expect to put in some kind of a lighting system for the purpose of enabling aviators to safely land at their airport during the night season. Depending upon the kind of a lighting system used, and the manner of its use, the same may or may not constitute a nuisance as against which the plaintiffs may be entitled to relief. Cornell Law Review Quarterly, vol. 15, p. 303, February, 1930.

■ However, as to this matter, as with many other matters which may arise in the operation of this airport, any action of the court at this time and in the present stage of this case would be premature. Plaintiffs have brought this action as promptly as possible, and they have the advantages which result from the earliest possible application to a court of equity. On the other hand, they suffer a disadvantage in that the practices which will prevail in the operation of this airport have not yet become established, and the court is therefore, in some respects, not justified in granting injunctive relief upon the theory that the defendants will not operate their airport with the most modern appliances and with the least possible annoyance and injury to the plaintiffs. Hazlett v. Marland Refining Co. (C. C. A. 8) 30 F.(2d) 808, 809. On the contrary, the evidence justifies the conclusion that the attitude of the defendants is such that they will undertake to so operate their airport as to subject the plaintiffs to the least possible inconvenience and annoyance.

■ Evidence has been offered upon the issue as to whether or not the property of the plaintiffs will decrease in value if the location of the airport upon the adjoining property is not enjoined. We find it unnecessary to determine this issue, for if it be conceded that the property of the plaintiffs will decrease in value if the airport is permitted to operate, that alone would not entitle the plaintiffs to an injunction. Hazlett v. Marland Refining Co., supra; 46 C. J. 682, Note 25. If the airport is not a nuisance, its operation may not be enjoined because to some extent the value of the plaintiffs' property will be decreased for the purpose to which it is now devoted. It is a matter of conjecture and speculation whether the property of the plaintiffs will increase in value for other purposes, and whether the plaintiffs will ultimately sustain actual financial loss because of the operation of the airport.

It may be conceded that the property of the plaintiffs will be less desirable for the purposes of a country estate. No one will contend that the plaintiffs will have the same enjoyment of peace and quiet which they have had in this locality for nearly a quarter of a century. This they have been able to have because of the use to which the adjoining prop-

934

erty was devoted, but they at no time had a right to prevent the adjoining owner from using this property for any reasonable purpose. They have been fortunate in that they have been able to enjoy their country estate as they have for so long a time. They must now yield to change and progress of the times.

■ 2. In the legislation hereinafter considered it is clear that both Congress and the State Legislature proceeded upon the theory that a landowner has no exclusive property in the higher air spaces. There is nothing in that legislation to indicate that either legislative body, in establishing the regulations regarding air navigation therein set forth, considered that there was involved the *taking* of any *property*. Both the Constitution of the United States and the Constitution of this state in broad terms protect rights of property, but neither contains any classification or definition of property, any more than they reveal the content of the word "liberty." Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. The determination of what the term "property" includes is a judicial function (and, within constitutional powers, a legislative function).

■ An owner's rights in land in this state are amply protected by constitutional guaranties; but what those rights are, so far as air space above the land is concerned, has not been declared by legislation, nor have such rights been fixed by the courts. That the landowner's rights are not limited to the surface of the earth, but extend into the space above it, is settled by many well-considered cases. A number of these cases will be referred to later on in this opinion. The plaintiffs rely strongly upon the ancient maxim, "Cujus est solum ejus est usque ad coelum," which has been frequently quoted and reiterated in the opinion of the courts and in legal literature generally for many generations. Certainly the possible rights of the landowner as to the air spaces over his land could not be more broadly asserted. The venerability of this maxim, its frequent repetition, and the high standing of many of those who have relied upon it, not only warrant, but call for, a careful consideration of its origin and application in adjudicated cases.

The first reference to the maxim in English law is Lord Coke's statement in Liber 1, section 1, page 4, where, in writing on the subject "Terra," he says:

"And lastly, the earth hath in law a great extent upwards, not only of water as hath been said, but of aire, and all other things even up to heaven, for cujus est solum ejus est usque ad coelum, as it is holden."

In support of his text, Lord Coke cites three cases from the Year Book: 22 H. VI, 59; 10 Edward IV, 14; 14 Henry VIII, 12. The first case is a dispute as to the ownership of six young goshawks as between landlord and tenant under a lease. The second case relates to the theft of muniments of title, in which the case of the goshawks is referred to. The latest one discusses the right of the Bishop of London as landlord to certain herrons and shovelers nesting in trees on land which the Bishop had leased.

As to the origin of the maxim itself, an examination shows that the words are attributable to Accursius, a glossator or commentator on the Code, who flourished in Bologna about the year 1200. Mr. Bouve, in a very interesting discussion on this same subject, finds evidence that the son of Accursius was taken to England by Edward I, on his return from the Holyland, and there lectured on subjects of Roman Law at the University of Oxford. It is suggested that this was the reason that the maxim gained currency, as stated in Burry v. Pope (1688) 1 Cro. Elizabeth, 118, as early as Edward I., who reigned from 1239 to 1307. But the phrase as used by its author, Accursius, was employed by him in a discussion of rights under the Code to have burial plots or tombs free from the interference of an overhanging building.

After Coke's commentaries there are two contemporaneous cases which should be noted. The earliest is Penruddock's Case (1597) 3 Coke's Reports, 205. In that case the defendant's building overhung plaintiff's land in such a way that rainwater fell upon it. The court held that the plaintiff had made out a case of nuisance and was entitled to abate the same.

The other case was Baten's Case (1611) 9 Coke's Reports 54 (b). Here again the defendant's house projected over the plaintiff's freehold. The court held that such projection constituted a nuisance and ordered an abatement thereof.

The next case after 1611 is that of Fay v. Prentice (1845) 1 C. B. 827. Here the defendant's cornice projected over the plaintiff's garden and precipitated rain water thereon. Judge Maule cited Penruddock's Case and Baten's Case, and held that the facts alleged constituted a nuisance.

The next case is Corbett v. Hill (1874) 9 L. R. Eq. 671. The plaintiff owned two con-

tiguous houses in London, one of which was sold to the defendant by a conveyance correctly describing the ground site of the house conveyed. One of the first-floor rooms in the house which the plaintiff retained projected over the site and was supported by a house which the plaintiff had conveyed to the defendant. The Vice Chancellor, Sir W. M. James, held that the plaintiff's house could not overhang the defendant's site, and, by way of dictum, stated that the defendant had a property right in the column of air over his entire property site and that the intrusion or overhanging of the plaintiff's house was a trespass thereto.

The next in order is the case of Ellis v. Loftus (1874) L. R. 10, C. P. 10. This was an action for injuries suffered by the plaintiff's horse as a result of being kicked by a horse belonging to the defendant. The defendant's horse did its kicking through an iron fence separating the property of the litigants. Three of the four judges indicated that the defendant was negligent in not more securely guarding its horse. There was also an agreement that some of the horse's body must have trespassed by invading the plaintiff's property. Mr. Justice Denman, in considering this phase of the case, quoted the familiar maxim, "Cujus est solum ejus est usque ad coelum."

In Clifton v. Bury (1887) 4 L. T. R. 8, the court held that target practice across the plaintiff's property constituted a nuisance with reference to the bullets that actually struck on the property, but not with respect to those that passed across the property without touching it.

Side by side with these cases we have the familiar remark of Lord Ellenborough in Pickering v. Rudd (1815) 4 Camp. 219, in which he said:

"I do not think it is a trespass to interfere with the column of air superincumbent on the close * * * But I am by no means prepared to say that firing across a field in vacuo, no part of the contents touching it, amounts to a clausum fregit, Nay, if this board overhanging the plaintiff's garden be a trespass, it would follow that an aeronaut is liable to an action of trespass quare clausum fregit at the suit of the occupier of every field over which his balloon passes in the course of his voyage."

These are the principal English cases from the time of Lord Coke to date, or at least beyond the date of the adoption of the Constitution of the United States in 1787, and to these cases we must look for an inter-pretation of the English common-law rights in air space.[1]

The decisions of the American courts have often been collected. It is sufficient for our purpose here to quote from the pamphlet prepared by Frederick P. Lee, Legislative Counsel of the United States Senate, page 87, as follows:

"It has been held to be a trespass to thrust one's arm into the space over a neighbor's land, Hannabalson v. Sessions, 116 Iowa, 457, 90 N. W. 93, 93 Am. St. Rep. 250 (1902), or to shoot over another's land, Whittaker v. Stangvick, 100 Minn. 388, 111 N. W. 295, 10 L. R. A. (N. S.) 921, 117 Am. St. Rep. 703, 10 Ann. Cas. 528 (1907). * * * Overhanging branches constitute a legal wrong, either a trespass or a nuisance. Grandona v. Lovdal, 70 Cal. 161, 11 P. 623 (1886); Tanner v. Wallbrunn, 77 Mo. App. 262 (1898); Ackerman v. Ellis, 81 N. J. Law, 1, 79 A. 883 (1911); Countryman v. Lighthill, 24 Hun. (N. Y.) 405 (1881). A board attached to defendant's building and overhanging plaintiff's land constitutes a trespass. Puorto v. Chieppa, 78 Conn. 401, 62 A. 664 (1905).

"So also projecting eaves, Harrington v. McCarthy, 169 Mass. 492, 48 N. E. 278, 61 Am. St. Rep. 298 (1897); Aiken v. Benedict, 39 Barb. (N. Y.) 400 (1863); Huber v. Stark, 124 Wis. 359, 102 N. W. 12, 109 Am. St. Rep. 937, 4 Ann. Cas. 340 (1905), cornices, Wilmarth v. Woodcock, 58 Mich. 482, 25 N. W. 475 (1885); Lawrence v. Hough, 35 N. J. Eq. 371 (1882); Crocker v. Manhattan Life Ins. Co., 61 App. Div. 226, 70 N. Y. S. 492 (1901), roofs, Murphy v. Bolger, 60 Vt. 723, 15 A. 365, 1 L. R. A. 309 (1888), and walls, Barnes v. Berendes, 139 Cal. 32, 69 P. 491, 72 P. 406 (1902); Norwalk Heating & Lighting Co. v. Vernam, 75 Conn. 662, 55 A. 168, 96 Am. St. Rep. 246 (1903); Langfeldt v. McGrath, 33 Ill. App. 158 (1889); Codman v. Evans, 7 Allen (Mass.) 431 (1863); Lyle v. Little, 83 Hun. 532, 33 N. Y. S. 8 (1895), have been held to be wrongful and to give rise to an action of some sort. In Butler v. Frontier Telephone Co., 186 N. Y. 486, 79 N. E. 716, 11 L. R. A. (N. S.) 920, 116 Am. St. Rep. 563, 9 Ann. Cas. 858 (1906) it was held that ejectment would lie for the space occupied by a telephone wire strung across plaintiff's land at a height varying from 20

[1] This résumé of the English cases is a summary from an able brief filed in this case by Henry G. Hotchkiss, author of Hotchkiss on Aviation Law.

to, 30 feet. Vann, J., expressed himself as follows:

" "The surface of the ground is a guide, but not the full measure, for within reasonable limitations land includes not only the surface but alse the space above and the part beneath. * * * "Usque ad coelum" is the upper boundary, and while this may not be taken too literally, there is no limitation within the bounds of any structure yet erected by man. So far as the case before us is concerned, the plaintiff as the owner of the soil owned upward to an indefinite extent. *, * * According to fundamental principles and within the limitation mentioned space above land is real estate the same as the land itself. * * * Unless the principle of usque ad coelum is abandoned any physical, exclusive and permanent occupation of space above land is an occupation of the land itself and a disseisin of the owner to that extent.' "

Mr. Lee has quoted the article of George C. Bogert, at one time Dean of the Cornell University School of Law, and Chairman on the Committee on Uniform Aviation Act and the Conference of Commissioners on Uniform State Laws. 6 Cornell Law Review Quarterly, 271, 296, 297. See also Hotchkiss on Aviation Law, page 16, and the very excellent survey of the cases in an annotation, 42 A. L. R. 945.

In the cases of Peabody v. United States, 231 U. S. 530, 34 S. Ct. 159, 58 L. Ed. 351; Portsmouth Harbor Land & Hotel Co. v. United States, 250 U. S. 1, 39 S. Ct. 399, 63 L. Ed. 809; and Portsmouth Harbor Land & Hotel Co. v. United States, 260 U. S. 327, 43 S. Ct. 135, 67 L. Ed. 287, the Supreme Court of the United States held, in effect, that the shooting of guns across the land of an adjoining owner from forts within 200 feet of a corner of the adjoining owner's property constituted trespasses. It is fairly inferable from the location of the forts that the shots fired were at low altitudes. These cases do not determine the rights of a landowner to the superincumbent air space—certainly not as to lands situated in the state of Ohio.

The maxim relied upon was referred to in the cases of Winton v. Cornish (1831) 5 Ohio, 478; Frazier v. Brown, 12 Ohio St. 294, 304; and Winslow v. Fuhrman, 25 Ohio St. 639, 651; but in none of these cases was the court attempting to determine rights to air space in the higher altitudes normally traversed by the aviator.

The cases above referred to are those usually cited in support of the proposition that a landowner has the exclusive right to occupy all of the air space above his property to an indefinite extent. There doubtless are other cases along the same line, but the cited cases fairly show the trend of the decisions in the aspect here involved. It is safe to say that there are no cases which involve an adjudication of property rights as appurtenant to land in the air space which would normally be used by an aviator. It is true that in many of them the maxim is quoted, and, seemingly, is used by the courts as a basis for their decisions; but it is the points actually decided in the cases, not the maxim, which establish the law. In other words, it can be said that the maxim is the law only to the extent that it has been applied in the adjudicated cases. Maxims are but attempted general statements of rules of law. The judicial process is the continuous effort on the part of the courts to state accurately these general rules, with their proper and necessary limitations and exceptions. A maxim, said Sir Frederick Pollock, "is a symbol or vehicle of the law, so far as it goes; it is not the law itself, still less the whole of the law, even on its own ground." And in Yarmouth v. France, 19 Q. B. D. 647, 653, 17 E. R. C. 217, Lord Esher said:

"I need hardly repeat that I detest the attempt to fetter the law by maxims. They are almost invariably misleading; they are for the most part so large and general in their language that they always include something which really is not intended to be included in them."

The claims of the plaintiffs in invoking the maxim amount to an invocation of the doctrine of stare decisis, also called the doctrine of precedents. 19 C. J. 382, note 86. But this doctrine contemplates only such points as are actually involved and determined in a case. 7 R. C. L. pp. 1003 and 1004; Kentucky Coal Lands Co. v. Mineral Development Co. (C. C. A. 6) 219 F. 45, 46; C. F. Medaris Co. v. Commissioner of Internal Revenue (C. C. A. 6) 38 F.(2d) 812, 813; and Hill v. Atlantic & N. C. R. Co., 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606, 622, 623; also, Losee v. Buchanan, 51 N. Y. 476, 484, 10 Am. Rep. 623.

So far we have considered the maxim as if there were no question as to its real meaning. Its meaning has never received critical examination and discussion by the courts, and there is a grave question as to whether or not the proponents of the maxim make any real

progress by advancing it as a basis for the claim that an owner of land has exclusive proprietary rights to an indefinite extent in the superincumbent air space. This point has received careful consideration in a learned article by Hiram L. Jome, in 62 American Law Review (November–December, 1928) pp. 894 and 895, from which we quote:

"The common law maxim states that the landowner owns *up to but not including the caelum*. What, then, was the *caelum*? Though the word was loosely used by Latin writers, it was commonly employed to refer to the lower airspace, the area in which the birds fly and the clouds drift and from which the rain falls and the lightning strikes. Occasionally it meant God, 'heaven the home of the happy dead,' and the resting place of the stars. Birds fly near the ground, storm clouds sometimes hover at an altitude of a few hundred or a thousand feet. It is only up to the beginning of this *caelum* which the landowner owns. Virgil refers to a '*machina æquata caelo*'—a derrick equal in height to the *caelum*. The machine of which he sings stood on top of a wall. The entire distance probably did not exceed 100 feet. Apparently, therefore, according to good Latin usage, the *caelum* was a space which began only a short distance above the surface of the earth. One Latin scholar described it as the space lying only a little above the highest tree tops and buildings. The area below this *caelum* belongs·to the owner of the surface."

See, further, pages 894 to 897 of the foregoing article.

In a field in which the courts still are pioneering, we may also consult with profit the opinions of legal text-writers, which are usually learned and impartial. The Paquete Habana, 175 U. S. 677, 700, 701, 20 S. Ct. 290, 44 L. Ed. 320. Pollock, in his work on Torts (13th Ed.) p. 362, says, in part:

"It does not seem possible on the principles of the common law to assign any reason why an entry above the surface should not also be a trespass, unless indeed it can be said that the scope of possible trespass is limited by that of possible effective possession, which might be the most reasonable rule. \* \* \*"

This author is much quoted as announcing the rule that a landowner has an exclusive right to the air space above his land only to the extent that such ownership is necessary to and for effective possession. 32 Harvard Law Review, 569; 30 Columbia Law Review, 379.

Sir John Salmond, in his work on the Law of Torts (7th Ed.) p. 237, after discussing the maxim, Cujus est solum ejus est usque ad coelum," comes to the conclusion:

"It does not follow from this, however, that an entry above the surface is in itself an actionable trespass; nor is there any sufficient authority that this is so. Such an extension of the rights of a landowner would be an unreasonable restriction of the right of the public to the use of the atmospheric space above the earth's surface. It would make it an actionable wrong to fly a kite, or send a message by a carrier pigeon, or ascend in an aeroplane, or fire artillery, even in cases where no actual or probable damage, danger, or inconvenience could be proved by the subjacent landowners. The state of the authorities is such that it is impossible to say with any confidence what the law on this point really is. It is submitted, however, that there can be no trespass without some physical contact with the land (including, of course, buildings, trees, and other things attached to the soil), and that a mere entry into the airspace above the land is not an actionable wrong unless it causes some harm, danger, or inconvenience to the occupier of the surface. When any such harm, danger, or inconvenience does exist, there is a cause of action in the nature of a nuisance.

"In respect of aeroplanes and other aircraft this matter is now dealt with by statute. By section 9 of the Air Navigation Act, 1920, it is provided that 'no action shall lie in respect of trespass or in respect of nuisance, by reason only of the flight of aircraft over any property at a height above the ground which, having regard to wind, weather and all the circumstance of the cases, is reasonable, or the ordinary incidents of such flight, so long as the provisions of this Act and any Order made thereunder and of the Convention are duly complied with.' "

Professor Francis M. Burdick, in his Law of Torts (4th Ed.), at page 406, after discussing intrusions upon land at low altitudes, states:

"So, it is submitted, throwing or firing a missile, or sending a balloon or driving an airplane through the air, over the land of another, sufficiently low to invade that space which the owner of the soil may effectively possess, amounts to a legal breaking of his close. But it is reasonable to believe that passage through the air space superjacent to land, at a height beyond that at which the owner of the soil can exercise effective possession, will not be treated as a trespass,

though dropping objects onto the land, or falling onto the land would constitute such trespass."

And see "The Jural Nature of Land" by Stuart S. Ball, 23 Illinois Law Review, 45 (1928–1929).

The decisions have not fixed the altitude to which a landowner may extend his rights. On the other hand, legislation which, however, does not purport to regulate the right to use air space, but which limits the height of buildings in cities, has been sustained as being constitutional. Welch v. Swasey, 193 Mass. 364, 79 N. E. 745, 23 L. R. A. (N. S.) 1160, 118 Am. St. Rep. 523; affirmed in Welch v. Swasey, 214 U. S. 91, 29 S. Ct. 567, 53 L. Ed. 923 (1909).

█ It appears from these authorities that the maxim has never been applied in cases which fix rights in air space normally traversed by the aviator. There are no precedents or decisions which establish rules of property as to such air space. The courts have never critically analyzed the meaning of the maxim, and there is much doubt whether a strict and careful translation of the maxim would leave it so broad in its signification as to include the higher altitudes of space. No constitutional or legislative provisions or statutes have heretofore established any exclusive proprietary rights in a landowner to the superincumbent air space normally traversed by the aviator. Constitutional provisions guaranteeing the right of property do not, in our opinion, forbid legislation which has for its purpose the regulation and adjustment of the conflicting rights and interests of the landowner and the public. Any regulatory legislation, not unreasonable or arbitrary, and not abridging unreasonably a landowner's right of effective possession, would be constitutional, it seems to us, as against the constitutional guaranties protecting property.

3. We come now to a consideration of the legislation affecting avigation. For some years prior to 1926 there was extended discussion by committees of the American Bar Association and writers in legal magazines as to the power of Congress and the State Legislatures to enact regulatory legislation relating to avigation. At first the view was expressed that, because of the supposed rights of a landowner under the maxim, "Cujus est solum ejus est usque ad coelum," the use of the air space for avigation could, unless with the consent of the landowner, be obtained only through the exercise of the right of eminent domain; but soon the consensus of opinion was that Congress and the State Legislatures had the power to enact reasonable regulations to adjust private rights and harmonize conflicting interests relating to avigation, and that landowners, at most, did not have exclusive rights in the superincumbent air space. The power of Congress was considered from the point of view of different grants of power to Congress, including the war power, the maritime power, power to make treaties, and the power to regulate commerce among the various states and foreign countries. Hotchkiss on Aviation Law, §§ 54–57; Zollman, Law of the Air, § 54 et seq. It may be assumed in this case that in enacting the Air Commerce Act of 1926 (49 USCA § 171 et seq.), Congress has legislated under the latter grant of power (Neiswonger v. Goodyear Tire & Rubber Company (D. C.) 35 F.(2d) 761, 763; The Air Commerce Act of 1926, by Frederick P. Lee, American Bar Association Journal, June, 1926, and 78 University of Pennsylvania Law Review, 663; "Federal Aeronautics Legislation," 76 University of Pennsylvania Law Review, 798), within the field of which power Congress exercises police power. 2 Willoughby on The Constitution of the United States, § 476, p. 780; The Lottery Cases, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492; Brooks v. United States, 267 U. S. 432, 436, 437, 45 S. Ct. 345, 69 L. Ed. 699, 37 A. L. R. 1407.

The provisions of the Air Commerce Act of 1926 which it is necessary to consider in arriving at a conclusion in this case are:

"Sec. 10. *Navigable Airspace.*—As used in this Act, the term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Secretary of Commerce under section 3, and such navigable airspace shall be subject to a public right of freedom of interstate and foreign air navigation in conformity with the requirements of this Act." (49 USCA § 180).

Section 3 (e) of the act provides:

"*Regulatory Powers.*—The Secretary of Commerce shall by regulation—* * * (e) Establish air traffic rules for the navigation, protection, and identification of aircraft, including rules as to safe altitudes of flight and rules for the prevention of collisions between vessels and aircraft." (49 USCA § 173 (e).

█ There can be no doubt of the power of Congress to authorize the Secretary of Commerce to promulgate regulations which are not violative of constitutional rights, and such regulations have the force of law. United States v. Grimaud, 220 U. S. 506, 31 S.

Ct. 480, 35 L. Ed. 563; McKinley v. United States, 249 U. S. 397, 39 S. Ct. 324, 63 L. Ed. 668; Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202; United States v. Michigan Portland Cement Co., 270 U. S. 521, 525, 46 S. Ct. 395, 70 L. Ed. 713; Commonwealth v. Slocum, 230 Mass. 180, 119 N. E. 687.

Pursuant to the power vested in him, the Secretary of Commerce promulgated the air commerce regulations, and among these chapter 7, section 74 (G), provides:

"*Height over Congested and Other Areas.*—Exclusive of taking off from or landing on an established landing field, airport or on property designated for that purpose by the owners, and except as otherwise permitted by Section 79 (the provisions of Section 79 are not pertinent here), aircraft shall not be flown—

"(1) Over the congested parts of cities, towns, or settlements, except at a height sufficient to permit of a reasonably safe emergency landing, which in no case shall be less than 1000 feet.

"(2) Elsewhere at a height less than 500 feet, except where indispensable to an industrial flying operation."

This regulation, in so far as it designates 1,000 feet over congested areas and 500 feet elsewhere, has been construed generally by the officials of the Department of Commerce of the United States as a prescription of minimum safe altitudes of flight, as the Secretary of Commerce was empowered to do under sections 3 and 10 of the Air Commerce Act of 1926 (49 USCA §§ 173, 180). Brewster v. Gage, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457. Counsel for the defendants assert that under the above regulations they have a right to fly over the property of the plaintiffs at altitudes in excess of 500 feet, and at lesser altitudes in taking off from or landing on the landing field established by them. We shall hereinafter in this opinion consider the validity of their claim.

The Air Commerce Act of 1926 (49 USCA §§ 171 et seq.) having been passed by Congress, the Legislature of the State of Ohio, which had not theretofore passed any regulatory legislation, enacted a general act "relative to aeronautics." This act became effective June 26, 1929 (113 Ohio Laws, p. 28). Certain provisions of that act are set out at the close of this opinion. The act provides for the creation of a bureau of aeronautics to be administered by a director of aeronautics. Section 6310—38, General Code. It is made his duty to administer and to enforce the provisions of the act. He is authorized to make and enforce necessary regulations, and the act provides that such regulations shall conform to and coincide with, so far as possible, the provisions of the Air Commerce Act of 1926, and amendments thereto, passed by the Congress of the United States, and the air commerce regulations issued pursuant thereto. While the act of Congress is very broad in scope, and attempts to cover every phase of avigation, the act enacted by the Ohio Legislature contains only seven sections. It was passed with an intention upon the part of the Ohio Legislature that avigation in the state of Ohio should be, in so far as possible, subject to regulation by the Air Commerce Act of 1926. The act manifests an intention on the part of the Legislature to take advantage of the extensive administrative machinery which had been established by the Department of Commerce under the enabling provisions of the Air Commerce Act of 1926. Pursuant to this policy, the Ohio act does not provide for a method or system for the licensing of persons engaged in operating aircraft in intrastate commerce. It provides that if "a license to operate aircraft issued by the United States government would then be required if such avigation were interstate," an aviator to engage in intrastate avigation must procure the license required by the national act. General Code, § 6310—40. The act does not provide for the registration of aircraft except that aircraft within the state shall conform, with respect to design, construction and airworthiness, to standards prescribed by the United States government with respect to avigation of aircraft subject to its jurisdiction. Section 6310—42, General Code. Both of the provisions of the Ohio act just referred to recognize, and in express language state, that the provisions of the federal act are adopted because the "public safety" requires it, and the "advantages of uniform regulation" make it desirable in the interest of aeronautical progress.

This review has been made necessary because the Ohio act, while recognizing the existing public right of avigation, does not in express terms, as other acts do (Smith v. New England Aircraft Co. [Mass.] 170 N. E. 385, 391), fix the altitude at which such avigation must lawfully take place. But we think it is clear from the foregoing review that it was the intention of the Ohio Legislature to acquiesce in and to adopt the provisions of the Air Commerce Act of 1926, so far as the proper altitudes of flight are concerned. The Legislature recognized that the

regulation of avigation is largely a national problem; that there should be uniformity of regulation as between the state and the nation; and that, if the necessities of the situation required it, the act of Congress might in many respects be paramount. It seems to us that many of the regulatory measures and traffic rules promulgated under the Air Commerce Act of 1926 would be very difficult to enforce if the state were permitted to adopt different regulations and different traffic rules for intrastate commerce; and while some doubt has been expressed upon the subject (Neiswonger v. Goodyear Tire & Rubber Company, supra), we think it would be extremely difficult to enforce the minimum altitude rule of the national act if the state established a lower minimum altitude than that established by the national act. The conclusion that this was recognized by the Legislature of the State of Ohio, and that by its silence upon that point it intended to acquiesce in and to adopt the minimum altitudes prescribed by the national act, is strengthened by the consideration that the Ohio act, as we have seen, compels aviators to obtain licenses under the national act, which makes them subject in all respects to the provisions of the national act, and requires them to fly above the minimum altitudes prescribed by the national act.

All of the aviators, whether engaged in interstate or intrastate commerce, operating from the airport of the defendants, or elsewhere in this state, will be required to procure licenses issued by the United States government. General Code, § 6310—40. They will be compelled to comply with the air traffic rules promulgated by the Secretary of Commerce under sections 10 and 3 (e) of the Air Commerce Act of 1926 (49 USCA §§ 180, 173 (e). Unless they comply with these air traffic rules, their licenses are subject to suspension or revocation, Regulations, section 62–F; and they will perhaps be subject to civil penalties, in the event of their violation of the air traffic rules, Regulations, sections 71, 72. The application of the above provisions is recognized by section 6310—43 of the General Code which makes it a misdemeanor, punishable by fine or imprisonment, to violate the Ohio act; and further provides that the "acts or omissions made unlawful by this act shall not be deemed to include any act or omission which violates the law, or lawful regulations of the United States."

It is our conclusion, therefore, that, in so far as the minimum altitudes of flight are legally prescribed by section 74 (G) of the National Air Traffic Rules, they are in this state applicable alike to interstate commerce and intrastate commerce; and that since the property of the plaintiffs is not situated in congested parts of cities, towns, or settlements, the minimum altitude rule of 500 feet is applicable to all aviators flying over their property, whether engaged in interstate or intrastate commerce.

We cannot agree with the contention that this establishment of a 500-foot minimum altitude rule is an unreasonable or arbitrary exercise of the police power, in that it denies effective possession of their property to plaintiffs and amounts to an unlawful taking of plaintiffs' property without due process of law.

The power to announce general rules was by the act of Congress vested in the Secretary of Commerce. The exigencies of government often require in the enactment of proper legislation the expert and continuing experience of a department of the government; and what was said by Mr. Justice Harlan, in Field v. Clark, 143 U. S. 694, 12 S. Ct. 495, 505, 36 L. Ed. 310, is applicable here:

"The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation."

A fixing of the proper altitude rules requires a knowledge of conditions generally throughout the country, a general knowledge of the ability to safely operate airplanes, their ability to take off or to land without injury to others, and many other matters, in an industry which is still new and to some extent in an experimental stage. The law requires that the Secretary of Commerce keep himself advised of all matters pertaining to aviation, and we have before us many pamphlets and compilations issued by the Department of Commerce which indicate the broad and extensive knowledge of that department as to matters pertaining to aviation. We think the prescribing of general rules was appropriately left with this department. It is better equipped than any other governmental agency to arrive at a correct

and equitable solution of the problem involved in announcing minimum safe altitudes of flight (The Air Commerce Act of 1926, 27 Columbia Law Review, 989). It is to be presumed that if further knowledge as to aviation suggests or dictates such a course, the Secretary of Commerce will change the rules prescribing minimum safe altitudes of flight, having in mind both the interests and rights of the aviator and those of the landowner. The power of the courts to declare a regulation of the kind here involved to be unreasonable or arbitrary should be sparingly exercised, and especially so in a new and partly untried field. A regulation, like a rate, should not be condemned until it has had a fair and adequate trial. Northern Pacific Ry. v. North Dakota, 216 U. S. 579, 30 S. Ct. 423, 54 L. Ed. 624; Georgia v. Tennessee Copper Company, 206 U. S. 230, 239, 27 S. Ct. 618, 51 L. Ed. 1038, 11 Ann. Cas. 488.

It is well to have in mind in this connection also that while the modern conception of the ownership or possession of a chattel, land, or space imports wide freedom in use and control thereof, there is no such thing as absolute and complete freedom under our law. There are many limitations, sometimes in the interest of neighbors, and sometimes in the public interest, which are placed upon the owner's freedom. As was said in Hibbard v. Halliday, 58 Okl. 244, 158 P. 1158, L. R. A. 1916F, 903:

"Property in land must be considered for many purposes not as an absolute, unrestricted dominion, but as an aggregation of qualified privileges, the limits of which are prescribed by the equality of rights and the correlation of rights and obligations necessary for the highest enjoyment of land by the entire community of proprietors."

See, also, Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567 and Middlesex Co. v. McCue, 149 Mass. 103, 21 N. E. 230, 14 Am. St. Rep. 402.

These authorities announce rules as to the limitations upon the property rights in the interest of adjoining property owners, and In re Opinion of The Justices, 103 Me. 506, 69 A. 627, 19 L. R. A. (N. S.) 422, 13 Ann. Cas. 745, is one of many cases holding that many limitations may be imposed upon the rights of property for the benefit of the public. It was held in that case that it was for the Legislature to determine from time to time the occasion and what laws and regulations were necessary or expedient for the defense and benefit of the people; and that:

"Legislation to restrict or regulate the cutting of trees on wild or uncultivated land by the owner thereof, etc., without compensation therefor to such owner, in order to prevent or diminish injurious droughts and freshets, and to protect, preserve, and maintain the natural water supply of springs, streams, ponds and lakes, etc., and to prevent or diminish injurious erosion of the land and the filling up of the rivers, ponds, and lakes, etc., would not operate to 'take' private property within the inhibition of the Constitution."

And see Hudson Water Co. v. McCarter, 209 U. S. 349, 355, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560, and Miller v. Schoene (1928) 276 U. S. 272, 48 S. Ct. 246, 72 L. Ed. 568.

In most instances of limitations upon the freedom of the landowner in furtherance of the public interest, the purpose is effected by merely denying to the former the exercise of certain privileges of use. The common law, however, furnishes examples of permitted encroachments by the public upon what is otherwise private territory. The duty of the land occupant to permit entries by members of the public in navigating navigable waters, though the beds thereof are privately owned, is outstanding and of general recognition. See Schulte v. Warren, 218 Ill. 108, 75 N. E. 783, 13 L. R. A. (N. S.) 745; Lumber Company v. Olcott Co., 65 N. H. 290, 21 A. 1090, 13 L. R. A. 826; Hutton v. Webb, 124 N. C. 749, 33 S. E. 169, 59 L. R. A. 33; State v. Shannon, 36 Ohio St. 423, 38 Am. Rep. 599; Willow River Club v. Wade, 100 Wis. 86, 76 N. W. 273, 42 L. R. A. 305. It has even been held that in such waters the public may fish. Collins v. Gerhardt, 237 Mich. 38, 211 N. W. 115. There is an obvious analogy between the public rights of avigation and navigation, particularly when the latter is in waters over land considered to be in private ownership. There are, of course, differences, and it may well be productive of difficulty to press the analogy too far.

Here the right of avigation necessary in times of peace, and for adequate defense in time of war, is involved, and the absolute ownership of private property may to some extent be limited and curtailed in a great public interest. It might justly be limited even for a seemingly private use, for "it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use." Mr. Justice Holmes, in

Noble State Bank v. Haskell, 219 U. S. 104, 110, 31 S. Ct. 186, 187, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487.

The property of plaintiffs, its location and surroundings, presents no unusual situation, and does not show that any rule which would be appropriate and reasonable for uncongested areas generally would be unreasonable as applied to the property of the plaintiffs. Counsel for the plaintiffs have offered no evidence which would indicate that flying at 500 feet would interfere with the comfortable enjoyment of their country estate by the plaintiffs. There is no evidence, for instance, that the flying should be at 600 feet or at higher altitudes. Counsel for both parties have agreed that the court should make observations at airports and other places to determine whether the altitude line of 500 feet protects the property rights of the plaintiffs. From such observations and a study of the question, if this court were called upon to designate the upper limit of effective possession under the facts of this case, it would, in the first instance, fix it at an altitude of 500 feet. We say in the first instance, because such upper limit is now being designated in view of the probabilities of the situation. It may be that when the practices of the defendants become fixed, it will be necessary, upon the application of the plaintiffs, to designate a higher altitude for defendants' flights. The probabilities of the situation now indicate that the plaintiffs will be amply protected if the flights of the defendants are made at minimum altitudes of 500 feet.

The further contention of defendants' counsel that they may under the regulations, without violating the property rights of effective possession of the plaintiffs, fly at lower altitudes, in taking off and landing, however, presents a different question. We cannot agree with this contention. It was not the purpose of the Air Commerce Act of 1926 to regulate the use of air space below minimum safe altitudes of flight (in this case now fixed by regulation at 500 feet), and there is granted in that act no authority to the Secretary of Commerce to regulate the use of rights in air space below such minimum safe altitudes. Below such altitudes the act does not apply to this case, and the court must protect the rights of the plaintiffs if there is an unreasonable interference with them, by the application of the rule of effective possession. The regulations relied upon, chapter 7, section 74 (G) (1) and (2), are a part of the Air Commerce Regulations (Aeronautics Bulletin No. 7, effective as amended September 1, 1929) which were intended and classified by the Secretary of Commerce as "Air-Traffic Rules." These rules, except as they prescribe 1,000 feet over congested areas and 500 feet elsewhere, were not intended as prescriptions of minimum safe altitudes for the purpose of fixing "navigable airspace" pursuant to authority vested in the Secretary of Commerce by sections 10 and 3 (e) of the Air Commerce Act of 1926. The exceptions in the air traffic rules permitting flights at less than 1,000 feet and less than 500 feet in taking off and landing were promulgated only to relieve avigators from the penalties prescribed by the air traffic rules. The right to fly at lower altitudes (save in exceptional cases which might not be regarded as trespasses) must in such instances be legally obtained by the aviator. Until the progress of aerial navigation has reached a point of development where airplanes can readily reach an altitude of 500 feet before crossing the property of an adjoining owner, where such crossing involves an unreasonable interference with property rights or with effective possession, owners of airports must acquire landing fields of sufficient area to accomplish that result. In such instances, to fly over the lands of an adjoining owner at lower altitudes, the owners of airports must secure the consent of adjoining property owners, or acquire such right by condemnation when appropriate enabling statutes are enacted. Smith v. New England Aircraft Co. (Mass.) 170 N. E. 385, 391, 393.[2]

Whether property rights or effective possession is interfered with unreasonably is a question of fact in the particular case.

With counsel for the parties the court has viewed plaintiffs' premises, and observed the flights of airplanes there, and, at the suggestion of counsel, has observed the flights of airplanes at other places. Although defendants may be able, in a measure, to curtail taking off and landing over plaintiffs' property, their plans contemplate very extensive operations both in their airport and flying school, and they expect to receive much outside patronage from the aviation industry generally. In this instance, in view of the magnitude of defendants' contemplated operations, in the opinion of the court the probability is that if defendants were permitted in taking off and landing to fly at altitudes lower than 500 feet, such flying, if it would not constitute trespasses, would at least constitute the maintenance of a nuisance.

[2] See an able article by Charles P. Hine, of counsel in this case, "Home Versus Aeroplane," American Bar Association Journal, April, 1930.

It is, of course, conceivable and very probable that in other cases, depending upon the character and extent of the operations of the adjoining airport, effective possession may not be interfered with by flights at lesser altitudes than 500 feet in taking off and landing.

As we have seen, the legislation of this state pertaining to aeronautics is different from that of other states; it acquiesces in and, in a measure, adopts the legislation of Congress. It is complementary to the legislation of Congress to the end that interstate and intrastate commerce may, so far as possible under present constitutional provisions, be a unit regardless of state lines. No doubt, also, the State Legislature of this state acquiesced in the view attributed to Congress that it had the power to enact and that it enacted the Air Commerce Act of 1926 under its express grant of power to regulate interstate and foreign commerce. It is unnecessary, therefore, for us to decide whether the state owns the air space above lands in this state in its sovereign capacity, so far as capable of ownership. Geer v. Connecticut, 161 U. S. 519, 16 S. Ct. 600, 40 L. Ed. 793; Lacoste v. Department of Conservation, 263 U. S. 545, 44 S. Ct. 186, 68 L. Ed. 437; Beach v. Hayner, 207 Mich. 93, 173 N. W. 487, 5 A. L. R. 1052; State v. Sawyer, 113 Me. 458, 94 A. 886, L. R. A. 1915F, page 1031, Ann. Cas. 1917D, 650; 11 R. C. L. 1014. Or whether it has the power to regulate the use of air space in analogy to its power to regulate the taking of feræ naturæ. Missouri v. Holland, 252 U. S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984; Foster-Fountain Packing Co. v. Haydel, 278 U. S. 1, 49 S. Ct. 1, 73 L. Ed. 147; Geer v. Connecticut, supra; 3 C. J. 18–22; 25 C. J. p. 596, § 8. Or the reduction to possession of oil and gas. Oklahoma v. Kansas Natural Gas Co., 221 U. S. 229, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193; Lindlay v. Raydure (D. C.) 239 F. 928, 933; Ohio Oil Co. v. Indiana, 177 U. S. 190, 208, 20 S. Ct. 576, 44 L. Ed. 729. Or the use and enjoyment of running water. Hudson County Water Co. v. McCarter, 209 U. S. 349, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560; Thompson on Real Property, vol. 1, § 67, p. 66; 2 Blackstone's Commentaries, p. 18; City of Syracuse v. Stacey, 169 N. Y. 231, 245, 62 N. E. 354; 22 Harv. Law Rev. 190; 40 Cyc. 559. Or the enjoyment of light and air. 19 Am. & Eng. Enc., 112, 113; Keiper v. Klein, 51 Ind. 316; Stein v. Hauck, 56 Ind. 65, 26 Am. Rep. 10; Muhlker v. New York & H. R. Co., 197 U. S. 544, 25 S. Ct. 522, 49 L. Ed. 872.

It is unnecessary also, in view of the character of the legislation of this state, to decide whether Congress has the power to regulate the use of such air space for the purposes of interstate and foreign commerce, in analogy to its right to regulate the use of navigable waters, in accordance with the rule announced in New Jersey v. Sargent, 269 U. S. 328, 337, 46 S. Ct. 122, 124, 70 L. Ed. 289, where reference is made to the doctrine, firmly settled. "That the power to regulate interstate and foreign commerce, which the Constitution vests in Congress, includes the power to control, for the purposes of such commerce, all navigable waters which are accessible to it and within the United States, whether within or without the limits of a state, and to that end to adopt all appropriate measures to free such waters from obstructions to navigation and to preserve and even enlarge their navigable capacity, and that the authority and rights of a state in respect of such waters within its limits, and in respect to the lands under them, are subordinate to this power of Congress." And see the extended discussion of the cases in "Civil Aeronautics," by Frederick P. Lee, Legislative Counsel, United States Senate (1928) pp. 42–45.

And it is unnecessary to decide whether Congress has, in the exercise of this paramount power to regulate interstate and foreign commerce, the power also, if necessary, to effectively regulate the latter, to regulate intrastate commerce incidentally, in analogy to the doctrine announced by Mr. Chief Justice Taft, in Railroad Commission v. Chicago, B. & Q. R. Co., 257 U. S. 563, 588, 42 S. Ct. 232, 237, 66 L. Ed. 371, 22 A. L. R. 1086, as follows:

"Commerce is a unit and does not regard state lines, and while under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of state authority. * * *"

And see Minnesota Rate Case, 230 U. S. 390, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Wisconsin Rate Case, 257 U. S. 583, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Chicago Board of Trade v. Ol-

sen; 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; United States v. Reading Co., 226 U. S. 324, 33 S. Ct. 90, 57 L. Ed. 243; New York v. United States, 257 U. S. 591, 42 S. Ct. 239, 66 L. Ed. 385; The Minnesota Rate Cases, 27 Harvard Law Review, 14; and Federal Control of Interstate Railroad Rates, 35 Harvard Law Review, 864.

Accordingly, it is our conclusion that the plaintiffs at this time are entitled to an injunction restraining the defendants:

(a) From permitting dust from their operations to fly or drift in substantial and annoying quantities over the property of the plaintiffs;

(b) From permitting the dropping or distributing of circulars from airplanes as they pass over plaintiffs' property or in proximity thereto; and,

(c) From avigating over the property of plaintiffs or any part thereof unless at altitudes of 500 feet or in excess thereof.

The plaintiffs' lands are highly improved and are not merely lands covered by dense brush and woods, as in Smith v. New England Aircraft Co. (Mass.) 170 N. E. 385, 393. And see Pollock v. Cleveland Ship Building Company, 56 Ohio St. 655, 47 N. E. 582. Plaintiffs are entitled to an injunction although the injury resulting from each separate flight may be trifling in amount. Lembeck v. Nye, 47 Ohio St. 336; 24 N. E. 686, 8 L. R. A. 578, 21 Am. St. Rep. 828; and Pollock v. Cleveland Ship Building Company, supra.

If the court has the power and authority to retain this cause upon the docket (Georgia v. Tennessee Copper Co., 240 U. S. 650, 651, 36 S. Ct. 465, 60 L. Ed. 846; Kansas v. Colorado, 206 U. S. 46, at pages 117, 118, 27 S. Ct. 655, 51 L. Ed. 956), and either party makes a request for such retention, this cause may be so retained for the purpose of granting other or further relief when the practices of the defendants become more definitely settled and established.

The costs of the present hearing are taxed against the defendants. An order may be drawn accordingly.

Note.—The Ohio statutes involved are as follows:

"Sec. 6310—38. There is hereby created a bureau of aeronautics which shall be administered by a director of aeronautics referred to hereafter in this act as the director. The director of aeronautics shall be appointed by the governor of the state and shall serve at his pleasure. He shall be paid a salary of $3,600.00 per annum. It shall be the duty of the director to, and he shall, administer and enforce the provisions of this act, and for such purpose he is authorized to make and enforce such regulations as are necessary to execute the functions vested in him, including regulations governing the marking of communities, which regulations shall conform to and coincide with, so far as possible, the provisions of the air commerce act of 1926 and amendments thereto passed by the congress of the United States, and air commerce regulations, issued pursuant thereto. * * *

"Sec. 6310—40. The public safety requiring, and the advantages of uniform regulation making it desirable, in the interest of aeronautical progress, that a person engaging within this state in operating aircraft, in any form of avigation for which a license to operate aircraft issued by the United States government would then be required if such avigation were interstate, should have the qualifications necessary for obtaining and holding such license, it shall be unlawful for any person to engage in operating aircraft within the state, in any such form of avigation, unless he have such a license. * * *

"Sec. 6310—42. The public safety requiring, and the advantages of uniform regulation making it desirable, in the interest of aeronautical progress, that aircraft to be avigated within this state should conform, with respect to design, construction and airworthiness, to standards then prescribed by the United States government with respect to avigation of aircraft subject to its jurisdiction, it shall be unlawful for any person to avigate an aircraft within this state unless it is registered pursuant to the lawful rules and regulations of the United States government then in force, if the circumstances of such avigation are of a character that such registration would be required in the case of interstate avigation.

"Sec. 6310—43. A person who violates any provision of this article shall be guilty of a misdemeanor and punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than ninety days or both; provided, however, that acts or omissions made unlawful by this act shall not be deemed to include any act or omission which violates the laws or lawful regulations of the United States; but it shall not be necessary to allege, or prove, as part of the case for the state, that the defendant is not amenable, on account of the alleged violation, to prosecution under the laws of the United States. That he is amenable to such prose-

cution shall be matter of defense, unless it affirmatively appear from the evidence adduced by the state."